Natalie Lyons, No. 293026
Vess A. Miller, No. 278020
COHENMALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
Tel: (317) 636-6481
nlyons@cohenmalad.com
vmiller@cohenmalad.com

*To move for *pro hac vice* admission
[*additional counsel listed on signature pages*]

***Counsel for Plaintiffs and the Proposed Class***

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| **MARTIN BELTRAN, NICOLLE AYERS, and PATRICE NORWOOD, individually and on behalf of all others similarly situated,**<br><br>**Plaintiffs**<br><br>**v.**<br><br>**NATIONSTAR MORTGAGE LLC d/b/a MR. COOPER,**<br><br>**Defendant.** | Civil Action No. _____<br><br>**CLASS ACTION COMPLAINT FOR:**<br>1. **Negligence**<br>2. **Negligence Per Se**<br>3. **Violation of Comprehensive Computer Data Access and Fraud Act, Cal. Pen. Code § 502**<br>4. **Violation of Consumer Protection Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.***<br>5. **Violation of Consumer Privacy Act, Cal. Civ. Code, §§ 1798.100, *et seq.***<br>6. **Breach of Express and Implied Contract**<br>7. **Unjust Enrichment**<br>8. **Declaratory Judgment**<br>9. **Breach of Confidence**<br>10. **Violation of Invasion of Privacy Act, Cal. Pen. Code §§ 630, *et seq.***<br>11. **Violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2511(1), *et seq.***<br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiffs, Martin Beltran, Nicolle Ayers, and Patrice Norwood, individually, and on behalf of all others similarly situated (hereinafter "Plaintiffs") bring this Class Action Complaint against Defendant, Nationstar Mortgage LLC d/b/a Mr. Cooper ("Mr. Cooper" or "Defendant"), and allege, upon personal knowledge as to their own actions, and upon information and belief as to all other matters, as follows.

## INTRODUCTION

1.    Plaintiffs bring this class action to address Defendant's outrageous, illegal, and widespread practice of disclosing—without consent—the Nonpublic Personal Information[1] and Personally Identifiable Financial Information[2] (together, "Personal and Financial Information") of Plaintiffs and the proposed Class Members to third parties, including Meta Platforms, Inc. d/b/a Meta ("Facebook" or "Meta"), Google, LLC ("Google"), Microsoft Corp. ("Microsoft"), DoubleClick, NewRelic, Optimizely, HotJar, and possibly others (collectively the "Third Parties") (in short, "the Disclosure").

2.    Mr. Cooper is a massive mortgage lender and servicer that provides services to customers across the globe and the United States, including in California and New York. To provide these services, Mr. Cooper operates and encourages its customers to use its website,

---

[1] The United States Congress defines "nonpublic personal information" as "personally identifiable financial information-- (i) provided by a consumer to a financial institution; (ii) resulting from any transaction with the consumer or any service performed for the consumer; or (iii) otherwise obtained by the financial institution." The Gramm-Leach-Bliley Act, 15 U.S.C.A. § 6809(4)(A) ("GLBA").

[2] "Personally identifiable financial information means any information: (i) A consumer provides to [a financial institution] to obtain a financial product or service from [the financial institution]; (ii) About a consumer resulting from any transaction involving a financial product or service between [a financial institution] and a consumer; or (iii) [a financial institution] otherwise obtain[s] about a consumer in connection with providing a financial product or service to that consumer." 16 C.F.R. § 313.3(o)(1).

2
CLASS ACTION COMPLAINT

https://www.mrcooper.com/ (the "Website"), on which customers can, among other things, access their account information, manage their mortgage, obtain information about Mr. Cooper's services, calculate and obtain quotes for mortgage payments and refinancing options, and apply mortgages or refinancing.

3.    Despite its unique position as a massive and trusted mortgage lender and servicer, Mr. Cooper used its Website to blatantly collect and disclose Consumers'[3] and Customers'[4] (collectively, "Customers") Personal and Financial Information to Third Parties uninvolved in the provision of mortgage services—entirely without their knowledge or authorization. Mr. Cooper did so by knowingly and secretly configuring and implementing code-based tracking devices ("trackers" or "tracking technologies") into its Website.

4.    Through these trackers, Mr. Cooper disclosed and continues to disclose Personal and Financial Information that Customers input into and accessed on Mr. Cooper's Website. This information includes without limitation, the user's status as a customer; whether the customer is logged in to Mr. Cooper's website; the user's browsing activities, including that the user clicked certain buttons and what URLs or webpages they led to; the user's refinancing options and customer selection; the reason the customer is seeking to refinance; that the user submitted a mortgage and/or refinancing application; the user's request for a quote and a summary of the user's selections; the type of property at issue; the state where the user's property is located; and the

---

[3] The term "consumer" means "an individual who obtains or has obtained a financial product or service . . . that is to be used primarily for personal, family, or household purposes, or that individual's legal representative." 16 C.F.R. § 313.3; 15 U.S.C.A. § 6809(9).

[4] "Customer means a consumer who has a customer relationship with [a financial institution]." 16 C.F.R. § 313.3. "The term 'time of establishing a customer relationship' shall . . . in the case of a financial institution engaged in extending credit directly to consumers to finance purchases of goods or services, mean the time of establishing the credit relationship with the consumer." 15 U.S.C.A. § 6809.

CLASS ACTION COMPLAINT

user's current stage of the homebuying process.

5.    Upon information and belief, Mr. Cooper utilized data from trackers to improve and to save costs on its marketing campaigns, improve its data analytics, attract new customers, and generate sales. Mr. Cooper benefited from use of Customers' Personal and Financial Information. Mr. Cooper further allowed the Third Parties, who are uninvolved in Mr. Cooper's provision of mortgage services, to profit from its Disclosure of Customers' Private and Financial information. And the Third Parties used Customers' Personal and Financial Information for themselves and disclosed to fourth parties who also profited off of it. Facebook, for example, will use the data collected from Customers of Mr. Cooper to sell ads to fourth parties who will further profit off the use of that information

6.    Customers, like Plaintiffs and Class Members, simply do not anticipate that a trusted mortgage lender and servicer will send their Personal and Financial Information to hidden Third Parties (who in turn share with fourth parties), all of whom profit off of it. Likewise, when Plaintiffs and Class Members used Defendant's Website, they thought they were communicating exclusively with a trusted mortgage lender and servicer for the sole purpose of obtaining mortgage information and/or services.

7.    At no time did Mr. Cooper disclose to Plaintiffs or Class Members that it was sharing their Personal and Financial Information with the Third Parties for third- and fourth-party use. Plaintiffs and Class Members never signed a written authorization permitting Defendant to send their Personal and Financial Information to the Third Parties who were uninvolved in the provision of financial services.

8.    Defendant owed a variety of duties, including common law, statutory, contractual, and regulatory duties, to keep Plaintiffs' and Class Members' Personal and Financial Information

safe, secure, and confidential.

9.     Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Personal and Financial Information, Defendant assumed legal and equitable duties to those individuals to protect and safeguard their information from unauthorized disclosure.

10.     The statutory and regulatory duties Mr. Cooper owed Customers include its obligations under federal law. For example, the GLBA requires that "each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801. Under this federal law, financial institutions like Mr. Cooper are explicitly prohibited from disclosing a Customer's Personal and Financial Information without sufficient advance notification and opt-out opportunity. 15 U.S.C. § 6801, *et seq*.

11.     Mr. Cooper ignored all its duties and obligations, including the GLBA's requirements, by disclosing Customers' Personal and Financial Information without proper advance notification and opt-out rights as required under the GLBA.

12.     Examples of "Personal and Financial Information" included in the GLBA are indistinguishable from the types of information Mr. Cooper disclosed to Facebook, Google, and Microsoft, including, among other things: (a) "[i]nformation a consumer provides to [Mr. Cooper] on an application to obtain a loan, credit card, or other financial product or service"; (b) "[t]he fact that an individual is or has been one of [Mr. Cooper's] customers or has obtained a financial product or service from [Mr. Cooper]"; (c) "information about [Mr. Cooper] consumer . . . disclosed in a manner that indicates that the individual is or has been [Mr. Cooper] consumer"; and (d) "any information [Mr. Cooper] collect[s] through an Internet 'cookie' (an information collecting device from a web server)." 16 C.F.R. 313.3(o)(2)(i).

13.     Mr. Cooper breached its duties under California state law, including, for example, the California Consumer Privacy Act. That statue provides California consumers with rights to control their personal information including the right to know what personal information is being collected about them and whether that information is sold or disclosed and to whom, the right to prohibit the sale of their personal information, and the right to request deletion of their personal information. Cal. Civ. Code § 1798.100, *et seq*. Mr. Cooper breached its obligations under this statute by, for example, failing to provide Customers with appropriate notice that their information was being disclosed to Third Parties for third- and fourth- party use. The notice and consent Mr. Cooper purports to provide and obtain, through the policies it provides on its website, is not appropriate or sufficient, as a reasonable Consumer would not have understood those policies as notifying them of Mr. Cooper's disclosure of their Personal and Financial Information to Third Parties for third- and fourth- party use.

14.     Mr. Cooper breached its common law, statutory, and contractual obligations to Plaintiffs and Class Members by, *inter alia*, (i) failing to adequately review its marketing programs and web based technology to ensure its Website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to collect and share Personal and Financial Information; (iii) aiding, agreeing, and conspiring with the Third Parties to intercept communications sent and received by Plaintiffs and Class Members; (iv) failing to obtain the written consent of Plaintiffs and Class Members to disclose their Personal and Financial Information to Third Parties for Third Party and fourth party use; (v) failing to protect Personal and Financial Information and take steps to block the transmission of Plaintiffs' and Class Members' Personal and Financial Information through the use of tracking technology; (vi) failing to warn Plaintiffs and Class Members; and (vii) otherwise failing to design and monitor its Website

to maintain the confidentiality and integrity of its customers' Personal and Financial Information.

15.    Plaintiffs seek to remedy these harms and brings causes of action of (I) Negligence; (II) Negligence Per Se; (III) Violation of the Comprehensive Computer Data Access And Fraud Act ("CDAFA"), Cal. Penal Code § 502; (IV) Violation Of California's Consumer Protection Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*.; (V) Violation of California Consumer Privacy Act ("CCPA"), 1798.100, *et seq*.; (VI) Breach of Express and Implied Contract; (VII) Unjust Enrichment; (VIII) Declaratory Judgment; (IX) Breach Of Confidence; (X) Violation of The California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 630, *et seq*.; (XI) Violation of The Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2511(1), *et seq*.; and (XII) Violation of The Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(3)(a) Unauthorized Divulgence By Electronic Communications Service.

16.    Plaintiffs bring this action, individually and on behalf of all others similarly situated, for damages and equitable relief.

## **PARTIES**

17.    Plaintiff Martin Beltran is a natural person and citizen of California, where he intends to remain. Plaintiff Beltran resides in Vallejo, Solano County, California. Plaintiff Beltran has a mortgage with Mr. Cooper and is a victim of Defendant's unauthorized Disclosure of Personal and Financial Information.

18.    Plaintiff Nicolle Ayers is a natural person and citizen of California, where she intends to remain. Plaintiff Ayers resides in Martinez, Contra Costa County, California. Plaintiff Ayers has a mortgage with Mr. Cooper and is a victim of Defendant's unauthorized Disclosure of Personal and Financial Information.

19.    Plaintiff Patrice Norwood is a natural person and citizen of New York, where she

intends to remain. Plaintiff Norwood resides in Westchester County, New York. Plaintiff Norwood had a mortgage with Mr. Cooper and is a victim of Defendant's unauthorized Disclosure of Personal and Financial Information.

20.     Defendant Nationstar Mortgage LLC d/b/a Mr. Cooper is a Delaware corporation that services mortgage loans. Defendant has its principal place of business in Coppell, Texas. Defendant transacts or has transacted business in this District and throughout the United States, including through its office in Lake Forest, California.

21.     Mr. Cooper is a financial institution, as that term is defined by Section 509(3)(A) of the GLBA, 15 U.S.C. § 6809(3)(A).

## JURISDICTION AND VENUE

22.     This Court has personal jurisdiction over Defendant because, personally or through its agents, Defendant operates, conducts, engages in, or carries on a business in this State, maintains corporate offices in California, and committed tortious acts in this State.

23.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds $5,000,000, exclusive of interest and costs. Complete diversity exists between Defendant and at least one member of the proposed Classes, and there are more than one hundred (100) members in the proposed Classes.

24.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 because it arises under the laws of the United States. The Court has supplemental jurisdiction over Plaintiffs' claims arising under state law pursuant to 28 U.S.C. § 1367.

25.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this district and continue to occur in this district.

CLASS ACTION COMPLAINT

## COMMON FACTUAL ALLEGATIONS

**A. Mr. Cooper: A Dominant Mortgage Lender and Servicer that Collects Personal and Financial Information Under the Guise of Protecting it**

26.     Nationstar Mortgages, LLC, is the consumer-facing mortgage lender and servicer that operates under the service mark "Mr. Cooper."

27.     Mr. Cooper provides "servicing, origination, and transaction-based services related principally to single-family residents throughout the United States."[5] "Serving 6.5 million homeowners, Mr. Cooper is one of the largest home loan servicers in the country."[6]

28.     Frequently, home buyers and homeowners are introduced to Mr. Cooper after their mortgage is sold or assigned to the company for servicing.

29.     On information and belief, Mr. Cooper provides mortgage services to Customers in every state in America.[7]

30.     Mr. Cooper represents to its customers that it "take[s] your privacy seriously."[8]

31.     Through its Website, Mr. Cooper allows users to explore various services relating to their mortgages and home loans such as home equity loans, cash-out refinancing, refinancing to lower monthly payments, applying for pre-approval and verified approval, loan applications and loan approval, and selling homes.[9]

---

[5] *About our Leaders*, MR. COOPER, https://www.mrcooper.com/about-us/leadership (last accessed May 12, 2025).

[6] *About Us: Purpose & Value*, MR. COOPER, https://www.mrcooper.com/about-us/purpose (last accessed May 12, 2025).

[7] *See, e.g.*, *Locations*, CapitalOne.com, https://locations.capitalone.com/ (last visited Aug. 8, 2024).

[8] *Terms and Conditions*, MR. COOPER, https://www.mrcooper.com/terms_of_use (last accessed May 12, 2025).

[9] *See Home Loan Types*, MR. COOPER, https://www.mrcooper.com/loans/types?internal_ref=loan_types_leftnav (last accessed May 12, 2025).

32.     Mr. Cooper's Website also encourages to use various mortgage calculators through which they can enter their personal and financial information to calculate their estimated payments, payoff amounts, qualifying loan amounts, refinancing options, homebuying budget, and options for renting versus buying a home.[10]  In short, Defendant encourages customers to use its Website to apply for, manage, and access their mortgages and accounts.

33.     Defendant encourages the use of its Website in service of its own goal of increasing profitability. In furtherance of that goal, Defendant purposely and secretly installed the Third Parties' online tracking technology onto its Website to gather and share information about Customers.

34.     Mr. Cooper utilized the information it collected to market its services and bolster its profits by surreptitiously diverting the information to Third Parties like Google and Facebook.

35.     But Defendant did not only collect information for its own use; Defendant also shared—and continues to share—Customers' information, including Personal and Financial Information, with the unauthorized Third Parties who then use it for their own benefit and to benefit fourth parties who are even further removed from the Customers.

**B. Third Parties and Trackers: Collectors and Profiteers of Personal and Financial Information**

36.     The invisible Third Party online tracking technologies installed by Mr. Cooper on its Website gathers a vast assortment of Customer data. The installation of these trackers—and thus their transmission of data—is in Mr. Cooper's exclusive control.

37.     When an individual accesses a webpage containing online tracking technology from a Third Party, the trackers instantaneously and surreptitiously duplicate communications with

---

[10] *See Mortgage Calculators*, Mr. Cooper, https://www.mrcooper.com/calculators (last accessed May 12, 2025).

that webpage and send them to the Third Party. The information travels directly from both the user's browser and the webpage owner's server and then on to the Third Party's server, based off instructions from the Third Party's tracker. The communications and information transmitted via these trackers are entirely in Defendant's control. Customers trust Mr. Cooper with the information they input on Mr. Cooper's Website, and Mr. Cooper is in complete and exclusive control of its Website and the data input therein.

38.     Online tracking technologies may not be deleted from an individual's device; they are built into a webpage, and a webpage Customer has no control or warning over their presence or data collection. Third party trackers cause information to flow directly from the website Customer's browser and the website owner's server to the Third Party itself. A webpage Customer cannot prevent or even detect this transmission of data.

39.     Accordingly, without any knowledge, authorization, or action by a user, a website owner who has installed Third Party trackers is utilizing website source code to commandeer its users' computing devices and web browsers, causing them to invisibly re-direct the users' communications to Third Parties.

40.     In this case, Defendant employed the Third Party trackers to intercept, duplicate, and re-direct Plaintiffs' and Class Members' Personal and Financial Information to the Third Parties contemporaneously, invisibly, and without the customer's knowledge.

41.     Consequently, when Plaintiffs and Class Members visited Defendant's Websites and communicated their Personal and Financial Information, that information was simultaneously intercepted and transmitted to the Third Parties.

42.     The Third Party trackers do not provide any substantive content on Mr. Cooper's Website. Their only purpose is to collect and share information to be used for the Third Party and

fourth parties' marketing and sales purposes.

43.     The Facebook or Meta Pixel, for example, "tracks the people and type of actions they take" on a website.[11] It can be used to gather customer data, identify customers and potential customers, target advertisements to those individuals, and market products and services. This includes when a user visits a particular webpage, clicks a button, fills out a form (including the information from the form like the state in which the property is located, the reason the customer is seeking to refinance, etcetera), IP addresses, web browser information, page location, any custom events set by the website owner, the tracker ID, and more.[12] Facebook does all of this by using the Meta Pixel to send "events" to its server.

44.     Once the data is collected via the Meta Pixel, Facebook aggregates it to build its own massive, proprietary dataset, which Facebook then uses to find new customers, drive sales, and understand ad impact. This is all to the benefit of the website owner, like Mr. Cooper, Facebook as the third party, and other fourth parties, all of whom use the information for targeted marketing campaigns. Targeting works by allowing fourth parties to direct their ads at particular "Audiences," subsets of individuals who, according to Facebook, are the "people most likely to respond to your ad."[13]

45.     Upon information and belief, the Meta Pixel installed on Mr. Cooper's website collects data including the "c_user cookie," which enables Facebook to link the user to their logged

---

[11] *Retargeting*, Meta, https://www.facebook.com/business/goals/retargeting (last visited Aug. 11, 2024).

[12] *See, e.g.*, *Meta Pixel*, Meta for Developers, https://developers.facebook.com/docs/meta-pixel/ (last visited Aug. 11, 2024); *Specifications for Facebook Pixel Standard Events,* Meta, https://www.facebook.com/business/help/402791146561655 (last visited Aug. 11, 2024); *see also Facebook Pixel, Accurate Event Tracking, Advanced*, Meta for Developers https://developers.facebook.com/docs/facebook-pixel/advanced/ (last visited Aug. 11, 2024).

[13] *Audience Ad Targeting*, Meta, https://www.facebook.com/business/ads/ad-targeting (last visited Aug. 14, 2023).

in Facebook account and thereby identify the user. The Meta Pixel has also reported information such as when the user visited the page for "loantype=get-cash," when the user submits an online application or completes a registration, and has historically reported to Facebook that the user was on a page for "simple-cash-options" when the user loads the page for "Getting Cash from Equity."

46.     Data harvesting is big business for Facebook; it drives Facebook's advertising sales, which are its profit center. In 2023, Facebook generated nearly $135 billion in revenue, roughly 98% of which was derived in advertising revenue alone space.[14] This business model is not limited to Facebook. Data harvesting one of the fastest growing industries in the country, and consumer data is so valuable that it has been described as the "new oil." Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 were as high as $434 per user, for a total of more than $200 billion industry wide.

47.     On information and belief, the trackers Defendant installed from other Third Parties, including Google, Microsoft, DoubleClick, New Relic, Optimizely, and HotJar, work similarly to the Meta Pixel and likewise transmitted Plaintiffs' and the Class Members' Personal and Financial Information without Plaintiffs' and Class Members' knowledge or authorization.

48.     The Google trackers allow Defendant to track and share with Google (1) who uses Mr. Cooper's Website; (2) whether the user is a customer of Mr. Cooper; (3) what actions the user performs on the Website such as what types of products the customer is viewing as well as the customer's selections on those pages, including the reason for the user's request; (4) when users

---

[14] *Meta Reports Fourth Quarter and Full Year 2023 Results*, Facebook
https://investor.fb.com/investor-news/press-release-details/2024/Meta-Reports-Fourth-Quarter-and-Full-Year-2023-Results-Initiates-Quarterly-Dividend/default.aspx (last visited Aug. 8, 2024).

visit the Website; (5) where on the website users perform these actions; and (6) how users navigate through the website to perform these actions. Google gathers this information using trackers embedded on Mr. Cooper's Website and generates corresponding reports.[15] DoubleClick is part of the suite Google uses to collect all of this.[16] Google's collection of this data "enables advertisers to more effectively create, manage and grow high-impact digital marketing campaigns."[17]

49.    The Microsoft tracker allows Defendant to "[t]rack what your customers are doing after they click on your ad."[18] According to Microsoft, the tracker "records what customers do on your website . . . [and] will collect data that allows you to track conversion goals and target audiences with remarketing lists."[19]

50.    The New Relic tracker is an application performance management tool, used for application monitoring, which can track every action a user performs on the website.[20]

51.    The Optimizely tracker is a 'post-click tracking' file that is automatically "loaded from a server when a customer clicks on a link" and "will not be noticed" by users.[21] "One

---

[15] *See generally*, *A big list of what Google Analytics can & cannot do*, MarketLyrics, https://marketlytics.com/blog/list-of-things-google-analytics-can-and-cannot-do/ (last accessed May 12, 2025).

[16] *See the DoubleClick Digital Marketing Suite,* Google Developers, https://developers.google.com/app-conversion-tracking/third-party-trackers/doubleclick (last accessed May 12, 2025).

[17] *See DoubleClick Digital Marketing*, Google Help, https://support.google.com/faqs/answer/2727482?hl=en (last accessed May 12, 2025).

[18] *Microsoft Advertising*, Microsoft.com, https://about.ads.microsoft.com/en/tools/performance/conversion-tracking#:~:text=Universal%20Event%20Tracking%20(UET)%20is,target%20audiences%20with%20remarketing%20lists (last visited June 26, 2024).

[19] *Id.*

[20] *Monitor, Debug and Improve Your Entire Stack*, New Relic, https://newrelic.com/(last visited Aug. 8, 2024)

[21] *Post-Click Tracking*, Optimizely, https://support.optimizely.com/hc/en-us/articles/4413205550733-Post-click-tracking (last visited May 13, 2025).

14
CLASS ACTION COMPLAINT

[Optimizely] tracking pixel can transmit up to 19 values."[22]

52.     Similarly, "[t]he Hotjar Tracking Code is used to trigger data collection when installed" and "is responsible for collecting and sending the data to" whichever Third Party installed the code.[23]

53.     Hotjar code, like the other trackers discussed herein, requires "administrative access to the web hosting of [the] site [the Third Party] want[s] to track" as well as "the ability to insert the Hotjar tracking code into the HTML of [the] pay [the Third Party] want[s] to track. This requires that [the Third Party] either own[s] the site or ha[s] explicit permission from the site owner to edit it."[24]

54.     The collection and disclosure of users' data via these trackers occurs automatically.

## C. Mr. Cooper Used Trackers to Disclose Personal and Financial Information Without Users' Authorization.

55.     On information and belief, Mr. Cooper installed each of these trackers, through which Mr. Cooper transmitted Customers' communications with Mr. Cooper's website and thus their Personal and Financial Information to the Third Parties without Customers' knowledge or authorization. This information included their browsing activities including the pages they viewed and the buttons they clicked; information revealed in the application process regarding (i) the products in which Customers were interested, (ii) the reason they were seeking the product, (iii) the user's status as a Mr. Cooper customer, and (iv) information about the Customer's property and application, including, without limitation, the Customer's stage in the home buying and/or

---

[22] *Id.*

[23] *What is the Hotjar Tracking Code?*, HOTJAR, https://help.hotjar.com/hc/en-us/articles/115011639927-What-is-the-Hotjar-Tracking-Code (last accessed May 11, 2025).

[24] *Platforms and Frameworks Not Compatible with Hotjar*, HOTJAR, https://help.hotjar.com/hc/en-us/articles/115012499507-Platforms-and-Frameworks-Not-Compatible-with-Hotjar (last accessed May 11, 2025).

selling process, the type of property at issue, and the state in which the property is located.

56.     On information and belief, since at least May 25, 2019, and at least as recently as May 5, 2025, Mr. Cooper has had tracking technologies installed on its Website.

57.     Accordingly, Mr. Cooper disclosed its Customers' data and Personal and Financial Information to the Third Parties, like Facebook, beginning some time prior to May 2019 and continuing up until at least May 2025.

58.     The information and data collected by these trackers allowed Third Parties like Meta, Google, and Microsoft to identify individual users and link those Customers to other online accounts, such as the Customer's Facebook account.

i.     *Mr. Cooper Installed Meta Pixels to Track Customers' Browsing Activities Across its Website.*

59.     Mr. Cooper discloses Customers' information to Meta via a Meta Pixel with ID 1498188900425660:

60.     Through this Meta Pixel, Mr. Cooper disclosed details about users' interactions with its Website, which allowed Meta to identify individual Customers and link them to any logged-in Facebook accounts. The Meta Pixel also permitted Meta to track Customers' activity on Mr. Cooper's Website. For example, a user seeking to refinance a loan can click on the button labeled "Getting Cash from Equity." After the user clicks on the button, Mr. Cooper would report to Facebook that the user is on a page for "simple-cash-options." If, on the following page, the Customer clicks the option to "Get Cash tap into your home's equity with or without refinancing

17

CLASS ACTION COMPLAINT

your first mortgage," the Meta Pixel historically would send an event to Facebook reporting that the user is on a page for "loantype=get-cash." Further, after the user completes a set of questions, Mr. Cooper reports to Facebook that the user submitted an application and completed registration.

    ii.    *Mr. Cooper's Installed Google and Microsoft Pixels to Track Customers' Activity and Share Customers' Personal and Financial Information.*

61.    Mr. Cooper also shares Customers' browsing activities and data with Microsoft and Google.

62.    For example, Mr. Cooper discloses users' status as existing loan customers when they log in to view their account details. As users authenticate and navigate to pages such as their loan overview and monthly statements, Mr. Cooper transmits events to third parties that reveal users' customer status.

63.    And when a user successfully logs in to Mr. Cooper's Website, Mr. Cooper sends events to Google and Microsoft disclosing that the user has landed on the "Loan Overview" page at "www.mycooper.com/servicing/overview." Mr. Cooper also sends a parameter to Google the user is logged in using the flag "logged_in:Y." And, if the user navigates to view their statement, Mr. Cooper reports to Google and Microsoft that the user is on the "Monthly Statements" page.

64.    If a user navigates to the refinancing pages on Mr. Cooper's Website, Mr. Cooper shares with Microsoft and Google: (a) users' selections from their applications; (b) users' progress as they navigate their applications; and (c) the type of information that users are requested by Mr. Cooper to provide. The data that Mr. Cooper shares about users includes the types of financial products that users intend to obtain and the specified reason for seeking such financial products.

65.    For example, if a Customer navigates to the "Getting Cash from Equity" page, the Website presents the user with options to (i) get cash by tapping into their home's equity; (ii) refinance; or (iii) buy or sell a home. Mr. Cooper discloses to Google and Microsoft what option

the user chooses at this step of the application, revealing the specific type of financial product that

the user is seeking. For example, if the user clicks to get cash, Mr. Cooper informs Google and

Microsoft that the user clicked to get "loantype=get-cash":



66.    If the user indicates that they want a loan to get cash, Mr. Cooper inquires why the

user is seeking cash and reports the user's answer to Google. For instance, if the user answers that

they plan to use the cash to pay off debt, Mr. Cooper reports to Google that the user's

"customer_intentions" for obtaining the loan is to "pay_off_debt":



67.    Mr. Cooper also reports to Google that the user is providing the following categories of information as part of their application to "get cash" with the intent to "pay_off_debt":

     a.    the amount the user would like to cash out;

     b.    the state in which the user's property is located;

     c.    the user's first name, last name, and email;

     d.    whether the user is an existing customer or not; and

e.    the user's home phone number.

68.    Once the Customer completes these questions, Mr. Cooper reports to Google and Microsoft that the user submitted their "lead_form."

69.    If the user attempt to obtain a quote online, Mr. Cooper notifies Microsoft that the user selected the option to "Get My Quote Online" and reports that Microsoft seeks to "Pay off Debt." Mr. Cooper also sends an event to Google with a summary of the user's selections, reporting that the user is seeking a loan for "simple_cash_options" and that the user seeks to "pay_off_debt" with the proceeds.

70.    As the next page loads, Mr. Cooper requests details about the user's property such as its location and the property type. Mr. Cooper discloses this information to Microsoft. For example, if the property is located in the state of California, Mr. Cooper notifies Microsoft that the Customer responded "California" on the page where Mr. Cooper asks the user "Where is the property loc[ated]." Additionally, Mr. Cooper discloses that the user is asked "What is the address" on their "rapidrefinance" loan application, and that the user provides the detail, "Single Family Residence." Later, Mr. Cooper discloses that the user responded "Primary Residence" on another page for their "rapid-refinance" loan.

71.    In the final step, Mr. Cooper requests the user's authorization to perform a soft credit check. If the user selects to provide authorization, Mr. Cooper sends another event to Google, disclosing that the user gives "credit_authorization" for an "Instant Quote – Soft Credit Check" for a "rapid-refinance" loan:



72.     If the user completes an online applications for purchasing or selling a home, Mr. Cooper reports the user's activities to third parties, disclosing (a) some of the users' responses from the application; (b) users' progress as they navigate the application; and (c) the types of information that users are providing Mr. Cooper.

73.     As part of the application, the Website asks the user to identify the stage of the home buying/selling process where they currently are: (i) looking at homes and listings; (ii) researching a purchase; (iii) ready to make an offer; (iv) signed a purchase agreement; or (v) selling

a home. Mr. Cooper discloses the user's response to Google. For example, if the user selects that

they signed a purchase agreement, Mr. Cooper sends an event to Google and Microsoft reporting

that the user provided that they have a "signed_agreement" while they are on a page for

"loantype=buy-or-sell."

74.     If the user is in the process of buying a home, Mr. Cooper asks the user whether

they are working with a real estate agent and reports that information to Google.



75.     Next, Mr. Cooper prompts the user to identify the state where the relevant property

is located and discloses the user's response to Microsoft. For example, if the user's property is

located in California, Mr. Cooper sends an event to Microsoft reporting that the user responded

with "California" in the event.

76.    When the user completes the initial set of questions and submits the application,

Mr. Cooper reports that information to Facebook, Microsoft and Google.

**D.  Mr. Cooper Uses Ambiguous, Disingenuous, and Deceptive Privacy Policies That Fail to Sufficiently Disclose or Notify Customers of Defendant's Data Sharing.**

*i.    Mr. Cooper's Privacy Representations*

77.    Customers never consented, agreed, authorized, or otherwise permitted Defendant

to intercept their Personal and Financial Information or to use or disclose it for marketing and

profit purposes. Customers were never provided with any written notice that Defendant disclosed

their Personal and Financial Information to Third Parties (who then allowed fourth parties to use

it for profit).

78.    Customers relied on Defendant to keep their Personal and Financial Information

confidential and securely maintained and to use this information only for the purpose of providing

legitimate financial services. Customers relied on Defendant to make only authorized disclosures

of this information.

79.    Furthermore, Defendant actively misrepresented it would preserve the security and

privacy of Customers' Personal and Financial Information.

80.     The contracts that Mr. Cooper has with its Customers include the "Privacy Policy,"[25] "Consumer Privacy Notice,"[26] and "California Privacy Notice"[27] (collectively, "Privacy Contracts").

81.     Mr. Cooper represents that it "take[s] your privacy seriously" and instructs Customers to read the privacy policy for details regarding Mr. Cooper's privacy practices.[28]

82.     Mr. Cooper's Privacy Policy reiterates that Mr. Cooper considers customer trust and confidence to be "a high priority"[29] and that "[k]eeping financial information is one of our most important responsibilities."[30]

83.     Accordingly, the Privacy Policy is clear that "[o]nly those persons who need it to perform their job responsibilities are authorized to access your information" and that Mr. Cooper "take[s] commercially reasonable precautions to protect your information and limit disclosure by maintaining physical, electronic and procedural safeguards."[31]

84.     The Privacy Policy identifies the parties with whom Mr. Cooper may share information, including:

    a.     "Within the Mr. Cooper family of companies, . . . . [a]ffiliate companies providing financial and other services, such as mortgage lenders, insurance agencies, home security companies, lawn care and pest control and residential homebuilders."[32]

---

[25] *Privacy Policy*, MR. COOPER, https://www.mrcooper.com/privacy (last accessed May 12, 2025) (Exhibit A).

[26] *Consumer Privacy Notice*, MR. COOPER, https://www.mrcooper.com/reference_documents/apollo_mr_cooper/MrCooper_Privacy_Notice.pdf (last visited May 12, 2022) (Exhibit B).

[27] *California Privacy Notice*, MR. COOPER, https://www.mrcooper.com/reference_documents/california_residents.pdf (last visited Mar. 12, 2024) (Exhibit C).

[28] *Terms and Conditions*, supra note 8.

[29] *Privacy Policy*, Ex. A at 1.

[30] *Id*. at 2.

[31] *Id*.

[32] *Id*.

b. "With Third Party Service Providers, Joint Marketers and As Otherwise Permitted by Law . . . . to provide services on our behalf in connection with the servicing of your account or to provide you with opportunities to buy products or services offered by us or jointly with other financial institutions. Consequently, we may disclose some or all of the information that we collect . . . to:

- Companies that perform services on our behalf, such as check and statement printers, data processing companies and vendors who monitor the status of insurance on the property

- Companies with whom we have joint marketing agreements"[33]

c. "With regulatory authorities and law enforcement officials."[34]

d. "To protect against fraud"[35]

e. "To report activity to credit bureaus"[36]

f. "To respond to a subpoena"[37]

g. "To service your account"[38]

h. "With Other Third Parties" such as "non-affiliated companies or other organizations, including:" "Financial service providers, such as mortgage bankers, securities broker-dealers and insurance agents"; "Non-financial companies, such as retailers, direct marketers, membership clubs and publishers"; "Other companies and organizations, such as non-profit organizations."[39]

85. The Privacy Policy promises: "For your protection, we require that these companies keep all personal information confidential."[40]

86. The Privacy Policy also notifies customers that "We" (i.e., Mr. Cooper, not any Third Party) "may send 'cookies' to your computer primarily to enhance your online experience"

---

[33] *Id*. at 3.
[34] *Id*.
[35] *Id*.
[36] *Id*.
[37] *Id*.
[38] *Id*.
[39] *Id*. at 3-4.
[40] *Id*. at 3.

as well as other "[t]racking systems" that deliver graphic images on a web page for the purpose of transferring data or letting Mr. Cooper "know whether you received and opened our e-mail."[41] Such disclosures never warn Customers that (1) Third Parties like Facebook, Google, or Meta will use cookies or trackers to obtain the confidential Personal and Financial Information that Customers provided to Mr. Cooper; or (2) that Mr. Cooper would share Customers' Personal and Financial Information with Third Parties to enable Third and Fourth parties to market Third and Fourth-Party products to Plaintiff and the Class that are unrelated to the mortgage services Mr. Cooper offers.

87.    The Consumer Privacy Notice recognizes that, under federal law, Customers may limit "sharing for nonaffiliates to market to" them.[42] Mr. Cooper's Consumer Privacy Notice represents:

> Federal law also requires us to tell you how we collect, share, and protect your personal information. . . ***The types of personal information we collect and share depend on the product or service you have with us***. This information can include:
> - Social Security number
> - Account balances and payment history
> - Transaction History
> - Income
> - Credit history and credit scores[43]

88.    But the types of personal information that Mr. Cooper collects and shares does ***not*** depend on the product or service a Customer has with it. Instead, Mr. Cooper indiscriminately collects and shares Customer information without regard to the product or service a Customer has with Mr. Cooper.

89.    Mr. Cooper "list[s] the reasons financial companies can share their customers'

---

[41] *Privacy Policy*, Ex. A at 5.
[42] Consumer Privacy Notice, Ex. B at 2.
[43] *Id.* (emphasis added).

personal information; the reasons Mr. Cooper chooses to share; and whether you can limit this sharing."[44] Those reasons include "our everyday business purposes -- such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus"; "For our marketing purposes -- to offer our products and services to you"; "For joint marketing with other financial companies"; "For our affiliates' everyday business purposes - information about your transactions and experiences"; "For our affiliates' everyday business purposes -- information about your creditworthiness"; "For our affiliates to market to you"; and "For our nonaffiliates to market to you."[45]

90.     The Consumer Privacy Notice defines an Affiliate as "Companies related by common ownership or control. They can be financial and nonfinancial companies."[46] Joint marketing is "A formal agreement between nonaffiliated financial companies that together market financial products or services to [Customers]."[47] Mr. Cooper's "joint marketing partners include companies such as other banks and insurance companies."[48] Certainly, Third Parties like Facebook do not meet either of these definitions. Mr. Cooper finally defines "nonaffiliates," which are "Companies not related by common ownership or control."[49] "They can be financial and nonfinancial companies."[50] Mr. Cooper identifies the types of "[n]onaffiliates" it can share with as "Financial service providers, such as mortgage bankers, securities broker-dealers and insurance agents &/or agencies" and "Non-Financial companies, such as retailers, direct marketers, membership clubs and publishers; and other companies and organizations, such as nonprofit

---

[44] *Id.*
[45] *Id.*
[46] *Id.* at 2.
[47] *Id.*
[48] *Id.*
[49] *Id.*
[50] *Id.*

organizations."[51] It is not clear that the Third Parties at issue fall under this category—Facebook, for example, is a social media company, not an insurance company, retailer, publisher, or nonprofit organization.

91.     In stating that it "can include" its Customers' Personal and Financial Information, the Consumer Privacy Notice grants Mr. Cooper the sole discretion to determine whether it will share Customers' information with nonaffiliates. It does not include any information explaining or specifying what information it shares with nonaffiliates or under what conditions and circumstances it may do so. Mr. Cooper thus maintains complete discretion on whether and what to disclose and when it discloses it.

92.     Customers reasonably understand that Mr. Cooper will securely maintain their Personal and Financial Information entrusted to it and protect that information from being shared or utilized by Third Parties (and fourth parties) that have nothing to do with Mr. Cooper or its services. Mr. Cooper's Consumer Privacy Notice only reinforced this reasonable understanding.

93.     Nevertheless, Mr. Cooper abuses the contractual discretion it reserved wholly for itself and acts in a manner that it knows to be inconsistent with its Customers' reasonable expectations under its Consumer Privacy Notice.

94.     By always exercising its discretion in its own favor and to the detriment of Customers, Defendant breaches the reasonable expectations of Customers and, in doing so, violates its duty to act in good faith.

95.     Finally, Mr. Cooper specifically represents to California residents that they have the "right[] to restrict the sharing of personal and financial information with our affiliates . . . and outside companies we do business with. Nothing in this form prohibits the sharing of information

---

[51] *Id.*

necessary for us to follow the law, as permitted by law, or to give you the best service on your accounts with us."[52]

96.　　California consumers like Plaintiffs Beltran and Ayers reasonably understand this language to mean that Mr. Cooper will only share their information with its affiliates or outside companies Mr. Cooper does business with as "necessary" to follow the law or to service consumers' accounts with Mr. Cooper.

97.　　In contrast to this reasonable understanding, Mr. Cooper indiscriminately shares Personal and Financial Information with nonaffiliated Third Parties, without Customers' consent and for Third Party and fourth party marketing purposes that have nothing to do with servicing consumers' Mr. Cooper accounts.

ii.　　*Third-Parties Further Share the Data and Information Collected from Trackers Installed on Mr. Cooper's Website with Fourth Parties.*

98.　　In addition to using the data for their own purposes, the third parties that obtain Customer data and information from trackers installed on Mr. Cooper's website further profit from Mr. Cooper's improper sharing practices by selling Customers' data to fourth parties.

99.　　As one study found, "on average, companies that allow external sharing of [] data assets have data that has been exposed to 42 4th-party domains."[53]

100.　　Consequently, a fourth party that did not have a tracker directly installed on the Mr. Cooper's website may obtain and use information collected via third-party trackers to provide direct advertisements to Customers on the fourth party's platform.

---

[52] *California Privacy Notice*, Ex. C at 1.
[53] Adam Gavish, *Your 3rd Party Collaborators Share Your Company's Data with 4th Parties*, DOCONTROL (Feb. 27, 2025), https://www.docontrol.io/blog/your-3rd-party-collaborators-share-your-company-data-with-4th-parties#:~:text=What%20is%204th%2DParty%20Data,side%20effect%20of%20SaaS%20collaboration.

101.    One common recipient of Customers' collected data is Facebook.

102.    For example, Facebook and Google have engaged in practices that allowed for the sharing or accessibility of user data between their platforms.[54] Because of this, advertisements on Facebook may reflect information collected via a Google tracker, either because of information shared directly or indirectly between the companies.

103.    Facebook and Google both act as data brokers, meaning they collect data, compile it into datasets, and sell it to third parties.[55] Two other popular data brokers are Acxiom and Oracle Data Cloud ("Oracle"). Facebook and Google have been known to buy information from, and sell information to, such data brokers.[56]

104.    Because of this, one company's tracker (e.g., Google Analytics) may collect information, compile it into a dataset (owned by Google), and act as a data broker to sell it to a third-party (e.g., Facebook), which uses the information to advertise for various parties (like other financial institutions) on its own platform.[57] Alternatively, one company's tracker (e.g., Google

---

[54] *See* Steven Musil, *Facebook gave tech giants more access to users data than it said*, CBSNews (Dec. 19, 2018), https://www.cbsnews.com/news/facebook-gave-tech-giants-more-access-to-users-data-than-it-said-new-york-times/ (last visited Apr. 24, 2025); Steven Musil, *Facebook acknowledges it shared user data with dozens of companies* (Jul. 1, 2018), https://www.cnet.com/tech/tech-industry/facebook-acknowledges-it-shared-user-data-with-dozens-of-companies/ (last visited Apr. 24. 2025); Paresh Dave and Katie Paul, *Google secretly gave Facebook perks, data in ad deal* (Dec. 17, 2020), https://www.reuters.com/article/technology/google-secretly-gave-facebook-perks-data-in-ad-deal-us-states-allege-idUSKBN28Q37G/ (last visited Apr. 24, 2025).

[55] *See* Jessie G Taft, *Facebook and Google Are the New Data Brokers* (Dec. 18, 2018, updated Jan. 5, 2021), https://dli.tech.cornell.edu/post/facebook-and-google-are-the-new-data-brokers (last visited Apr. 24. 2025)

[56] *See* Kalev Leetaru, *The Data Brokers So Powerful Even Facebook Bought Their Data* (Apr. 05, 2018), https://www.forbes.com/sites/kalevleetaru/2018/04/05/the-data-brokers-so-powerful-even-facebook-bought-their-data-but-they-got-me-wildly-wrong/ (last visited Apr. 24. 2025).

[57] *See* Don Marti, *et. al.*, *Who Shares Your Information With Facebook?* at 16 (Jan. 2024), https://innovation.consumerreports.org/wp-content/uploads/2024/01/CR_Who-Shares-Your-

Analytics) may collect information, compile it into a dataset (owned by Google), and act as a data broker to sell it to a fourth-party advertiser (e.g., another financial institution), which uses the information to advertise for on other platforms (e.g., Facebook).[58] Or, one company's tracker (e.g., Google Analytics) may collect information, sell either the raw data or a compiled dataset to a third-party data broker (e.g., Acxiom or Oracle), which third party data broker sells the information to a fourth party (e.g., Facebook), which uses the information for still other parties' targeted advertising.[59] In any event, the basic idea and results are the same. Google Analytics tracks and discloses information to fourth parties that use that data and information to advertise a variety of products on a variety of platforms.

105.    The information that data brokers like Acxiom and Oracle buy and compile from trackers (like Facebook's and Google's tackers) is inherently sensitive.

### E.  Mr. Cooper Violated the GLBA, FTC Standards, and Related Regulations

106.    As a financial institution, Mr. Cooper is subject to the GLBA. 15 U.S.C. § 6809(3)(A) (a "financial institution" is "any institution the business of which is engaging in financial activities..."). Defendant recognizes this, noting, "If you have a mortgage or an application with us, the information we have about you is protected under federal privacy laws—such as the Gramm Leach Bliley Act and the Fair Credit Reporting Act. It is therefore excluded from state privacy laws, and not covered by the disclosures below."[60]

---

Information-With-Facebook.pdf (explaining how Facebook uses aggregated data from external data brokers to target users on its platform).
[58] *Id.*
[59] *See* Kalev Leetaru, *The Data Brokers So Powerful Even Facebook Bought Their Data* (Apr. 05, 2018), https://www.forbes.com/sites/kalevleetaru/2018/04/05/the-data-brokers-so-powerful-even-facebook-bought-their-data-but-they-got-me-wildly-wrong/.
[60] *State Consumer Privacy Act Laws – FAQ*, Mr. Cooper, https://www.mrcooper.com/privacy/state (last accessed May 12, 2025).

107.    Pursuant to the GLBA, "each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a).

108.    The FTC has interpreted Section 5 of the FTC Act, 15 U.S.C. § 45, to include compliance with the GLBA Privacy Rule, 16 C.F.R. § 313.1, *et seq*. The FTC consistently enforces the GLBA Privacy Rule, as failure to comply with the GLBA Privacy Rule is an unfair act or practice prohibited by Section 5 of the FTC Act.[61]

109.    The GLBA Privacy Rule is a regulation that "governs the treatment of nonpublic personal information about consumers by the financial institutions." 16 C.F.R. § 313.1 *et seq*.

110.    Pursuant to the GLBA Privacy Rule, "[a] financial institution must provide a notice of its privacy policies and practices with respect to both affiliated and nonaffiliated third parties, and allow the consumer to opt out of the disclosure of the consumer's nonpublic personal information to a nonaffiliated third party if the disclosure is outside of the exceptions."[62] Mr. Cooper consistently fails to do this.

111.    The GLBA Privacy Rule, defines sensitive information that should not be indiscriminately disclosed:

> (n)     (1) Nonpublic personal information means:
>          (i) Personally identifiable financial information; and
>          (ii) Any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any personally identifiable financial information that is not publicly available.…
>          (3) Examples of lists—

---

[61] *See How to Comply with the Privacy Rule*, https://www.ftc.gov/business-guidance/resources/how-comply-privacy-consumer-financial-information-rule-gramm-leach-bliley-act ("The FTC may bring enforcement actions for violations of the Privacy Rule.").

[62] *See FTC, Financial Privacy Rule*, https://www.ftc.gov/legal-library/browse/rules/financial-privacy-rule (last visited August 8, 2024).

(i) Nonpublic personal information includes any list of individuals' names and street addresses that is derived in whole or in part using personally identifiable financial information (that is not publicly available), such as account numbers.…

(o)     (1) Personally identifiable financial information means any information:

(i) A consumer provides to you to obtain a financial product or service from you;

(ii) About a consumer resulting from any transaction involving a financial product or service between you and a consumer; or

(iii) You otherwise obtain about a consumer in connection with providing a financial product or service to that consumer.

(2) Examples—

(i) Information included. Personally identifiable financial information:

(A) Information a consumer provides to you on an application to obtain a loan, credit card, or other financial product or service;

(B) Account balance information, payment history, overdraft history, and credit or debit card purchase information;

(C) The fact that an individual is or has been one of your customers or has obtained a financial product or service from you;

(D) Any information about your consumer if it is disclosed in a manner that indicates that the individual is or has been your consumer;

(E) Any information that a consumer provides to you or that you or your agent otherwise obtain in connection with collecting on, or servicing, a credit account;

(F) Any information you collect through an Internet "cookie" (an information collecting device from a web server); and

(G) Information from a consumer report.

16 C.F.R. § 313.3

112.    The information that Mr. Cooper disclosed to Third Parties via trackers—including *e.g.*, information revealed in the application process regarding (i) the type and location of the Customer's property, (ii) the user's status as Mr. Cooper customer; (iii) the user's browsing activities, including that the user clicked certain buttons and what URLs or webpages they led to; (iv) the user's refinancing options and customer selection; (v) the reason the customer is seeking

to refinance; (vi) that the user submitted a mortgage and/or refinancing application; (vii) the user's request for a quote and a summary of the user's selections; (viii) the type of property at issue; and (ix) the user's current stage of the homebuying process (which is information Mr. Cooper obtained from the Customer in connection with providing financial products and services)—is "nonpublic personal information" under the GLBA and related regulations. 16 C.F.R. § 313.3.

113.    Mr. Cooper has utterly failed to meet its privacy obligations under the GLBA: it has explicitly disclosed Customers' nonpublic personal information and Personal and Financial Information to Third Parties for marketing and advertisement, including for Third Party and fourth party advertising use.

114.    Mr. Cooper fails to meet its notice obligations under the GLBA. "[A] financial institution may not, directly or through any affiliate, disclose to a nonaffiliated third party any nonpublic personal information, unless such financial institution provides or has provided to the consumer a notice that complies with section 6803 of this title." 15 U.S.C.A. § 6802. As outlined at length above, Mr. Cooper's Privacy Policies fail to put Customers on notice as required here and actually promise that Customers' Personal and Financial Information will not be shared with Third Parties (and fourth parties) for targeted advertising purposes.

115.    For example, by not including in its Privacy Policies that it discloses Customers' Personal and Financial Information to Third Parties for their use in their own advertising and marketing, the Privacy Policies fail to properly disclose:

> (1) the policies and practices of the institution with respect to disclosing nonpublic personal information to nonaffiliated third parties . . . including []the categories of persons to whom the information is or may be disclosed, other than the persons to whom the information may be provided [and] the policies and practices of the institution with respect to disclosing of nonpublic personal information of persons who have ceased to be customers of the financial institution . . .

(2) the categories of nonpublic personal information that are collected by the financial institution; [and]

(3) the policies that the institution maintains to protect the confidentiality and security of nonpublic personal information

15. U.S.C.A. § 6803.

116.    As detailed above, Mr. Cooper also fails to meet its opt out obligations under the GLBA. The GLBA Privacy Rule requires financial institutions to, for example, "provide an opt out notice" to Customers, which notice "must state…[t]hat the consumer has the right to opt out of that disclosure [and] [a] reasonable means by which the consumer may exercise the opt out right." 16 C.F.R. § 313.7. Under the GLBA, Mr. Cooper

may not disclose nonpublic personal information to a nonaffiliated third party unless—

(A) [it] clearly and conspicuously discloses to the consumer. . . that such information may be disclosed to such third party;

(B) *the consumer is given the opportunity*, before the time that such information is initially disclosed, *to direct that such information not be disclosed to such third party*; and

(C) the consumer is given an explanation of how the consumer can exercise that nondisclosure option.

15 U.S.C.A. § 6802 (emphasis added).

117.    Mr. Cooper fails to meet its opt out obligations because, as outlined above, Mr. Cooper does not clearly and conspicuously disclose to Customers its Disclosure of their Personal and Financial Information to Third Parties.

118.    Mr. Cooper further fails to meet its opt out obligations because Customers are not provided an opportunity before disclosure to direct the nondisclosure of their information—as described above, Mr. Cooper instantaneously discloses information when Customers visit its Website.

119.    By perpetually disclosing its customers' Personal and Financial Information to third parties without consent, Mr. Cooper failed and continues to fail to meet its obligations under the

GLBA, FTC standards, and related regulations, to establish appropriate standards and safeguards relative to Customers' Personal and Financial Information.

### F. Plaintiffs' Experiences

#### i. *Plaintiff Beltran*

120.    Plaintiff Martin Beltran obtained a mortgage with Bank of America in or around 2019. Mr. Coooper bought out the mortgage and so, in or around 2022, Plaintiff Beltran opened an online account with Mr. Cooper.

121.    Plaintiff Beltran regularly uses Mr. Cooper's Website to review his account and manage his mortgage.

122.    In or around 2022, Plaintiff Beltran researched refinancing options on Mr. Cooper's website.

123.    Plaintiff Beltran is a Facebook user.

124.    Beginning around the same time Plaintiff Beltran opened an online account with Mr. Cooper, he began receiving advertisements on Facebook and Google regarding refinancing. Over the past 3 years, Plaintiff Beltran has continued to receive regular ads on Facebook and Google regarding the services he reviews on Mr. Cooper's website.

#### ii. *Plaintiff Ayers*

125.    Plaintiff Nicolle Ayers obtained a mortgage with Bank of America in or around 2005. Mr. Coooper bought out the mortgage and so Plaintiff Ayers opened an online account with Mr. Cooper.

126.    Plaintiff Ayers regularly uses Mr. Cooper's Website to review her account and manage her mortgage. Plaintiff Ayers has also researched refinancing options on Mr. Cooper's website.

127.    Plaintiff Ayers is an Instagram and Facebook user.

128.    Plaintiff Ayers regularly receives advertisements related to her credit and options for loans, mortgages, refinancing, and real estate listings on Google and across Meta platforms such as Facebook and Instagram.

*iii.*    *Plaintiff Norwood*

129.    Plaintiff Patrice Norwood obtained a mortgage with Nationstar; however, Mr. Coooper bought out the mortgage. Accordingly, Plaintiff Norwood opened an online account with Mr. Cooper until the mortgage was repaid.

130.    While her mortgage remained open, Plaintiff Norwood regularly used Mr. Cooper's Website to review her account, manage her mortgage, and make payments. Plaintiff Norwood also researched refinancing options on Mr. Cooper's website.

131.    Plaintiff Norwood is an Instagram and Facebook user.

132.    Beginning at the time she was a Mr. Cooper mortgagor, Plaintiff Norwood regularly receives advertisements related to her credit and options for loans, refinancing, mortgages, and real estate listings on Facebook and Instagram.

133.    Plaintiffs accessed Defendant's Website at Defendant's direction and encouragement.

134.    Plaintiffs relied on Defendant's Website to communicate Personal and Financial Information and did so with the understanding that Mr. Cooper would not share their Personal and Financial Information except as agreed in the Privacy Policies.

135.    At no point did Customers like Plaintiffs sign any written authorization permitting Defendant to send their Personal and Financial Information to Third Parties (or fourth parties) uninvolved in providing them with financial or mortgage services.

136.    Plaintiffs reasonably expected that their communications with Mr. Cooper were confidential, solely between each Plaintiff and Mr. Cooper, and that, as such, those communications and any Personal and Financial Information submitted would not be transmitted to or intercepted by a third party (or used by a fourth party).

137.    Plaintiffs provided their Personal and Financial Information to Defendant and trusted that the information would be safeguarded according to Mr. Cooper's promises and the law.

138.    Had they been aware of Mr. Cooper's sharing practices, Plaintiffs would not have authorized Mr. Cooper to make their Personal or Financial Information available for sale on the resale market.

139.    Plaintiffs never intended to let Mr. Cooper benefit from their Personal and Financial Information.

140.    Through the systematic data sharing process described in this complaint, Plaintiffs' interactions with Mr. Cooper's online financial platform were disclosed to third parties, including Facebook. Plaintiffs did not consent to those disclosures.

141.    On information and belief, through its use of Third Party trackers on its Website, Defendant disclosed to Third Parties information Plaintiffs provided to Mr. Cooper as a financial institution and resulting from a transaction for Plaintiffs to obtain or access Defendant's mortgage services, including each Plaintiff's:

a.      Existing user or Customer status;

b.      Browsing activities, including the pages and content Plaintiffs viewed;

c.      Refinancing options and customer selections;

d.      Reason for refinancing;

e.      Confirmation that their online application was submitted;

CLASS ACTION COMPLAINT

f.      Request for a quote and a summary of their selections;

g.      Property type and location;

h.      Stage of the homebuying process;

i.      c_user cookie to identify a logged-in Facebook account; and

j.      Information collected through an Internet "cookie" (or information collecting device from a web server).

142.    By failing to receive the requisite consent, Mr. Cooper breached confidentiality and unlawfully disclosed Plaintiffs' Personal and Financial Information.

143.    Plaintiffs would not have submitted their information to Mr. Cooper if they had known it would be shared with Third Parties and further sold to fourth parties for purposes of marketing Third and fourth party products.

144.    As a result of Mr. Cooper's Disclosure of Plaintiffs' Personal and Financial Information via the Meta Pixel and other tracking technologies to Third Parties (and fourth parties) without authorization, Plaintiffs were harmed in the following ways:

a.      Loss of privacy;

b.      Unauthorized disclosure of their Personal and Financial Information;

c.      Unauthorized access to their Personal and Financial Information by Third Parties;

d.      Mr. Cooper benefited from the use of Plaintiffs' Personal and Financial Information without sharing that benefit with Plaintiffs;

e.      Repeated targeted advertisements from Third and fourth parties on social media and other third-party websites, reflecting Plaintiffs' Personal and Financial Information that was improperly disclosed and used;

f.   Lost benefit of their bargain with Mr. Cooper, as Plaintiffs did not receive the reasonable privacy and data security protections for which they paid;

g.   Mr. Cooper enriched itself at Plaintiffs' expense without sharing the revenue and profit attributable to collecting Plaintiffs' Personal and Financial Information without authorization and sharing it with Third Parties (and fourth parties);

h.   Mr. Cooper profited off of disclosing Plaintiffs' Personal and Financial Information without authorization and sharing it with Third Parties (and fourth parties) through savings in marketing costs;

i.   Mr. Cooper profited as a result of collecting Plaintiffs' Personal and Financial Information without authorization and sharing it with Third Parties (and fourth parties) through its revenues and profits attributable to serving and monetizing advertisements directed to Plaintiffs;

j.   Plaintiffs lost their ability to keep their Personal and Financial Information private or allow Mr. Cooper to track their data;

k.   Embarrassment, humiliation, frustration, and emotional distress;

l.   Decreased value of Plaintiffs' Personal and Financial Information;

m.   Increased risk of future harm resulting from future use and disclosure of their Personal and Financial Information; and

n.   Statutory damages.

## **TOLLING, CONCEALMENT, AND ESTOPPEL**

145.   The applicable statutes of limitation have been tolled as a result of Mr. Cooper's knowing and active concealment and denial of the facts alleged herein.

146.   Mr. Cooper seamlessly incorporated trackers into its Website while providing

Customers using those platforms with no indication that their Website usage was being tracked and transmitted to Third Parties. Mr. Cooper knew that its Website incorporated trackers, yet it failed to disclose to Plaintiffs and Class Members that their sensitive Personal and Financial Information would be intercepted, collected, used by, and disclosed to Third Parties.

147.    Plaintiffs and Class Members could not with due diligence have discovered the full scope of Mr. Cooper's conduct, because there were no disclosures or other indication that they were interacting with websites employing tracking technology to unauthorizedly disclose their Personal and Financial Information to unaffiliated Third Parties or that their information would subsequently be sold to fourth parties for the purpose of marketing third and fourth party products.

148.    All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Mr. Cooper's illegal interception and disclosure of Plaintiffs' and the Class's Personal and Financial Information has continued unabated. What is more, Mr. Cooper was under a duty to disclose the nature and significance of its data collection practices but did not do so. Mr. Cooper is therefore estopped from relying on any statute of limitations defenses.

## **CLASS ACTION ALLEGATIONS**

149.    Plaintiffs bring this nationwide class action on behalf of themselves and on behalf of all other similarly situated persons pursuant to Fed. R. Civ. P. 23.

150.    Plaintiffs seek to represent the following classes:

**Nationwide Class**: All individuals in the United States who have had or applied for mortgage services with Mr. Cooper within the applicable statute of limitations and whose Personal and Financial Information was disclosed by Defendant to Third Parties through Defendant's Website's tracking technology without authorization.

**California Subclass**: All citizens of California who have had or applied for mortgage services with Mr. Cooper within the applicable statute of limitations and

whose Personal and Financial Information was disclosed by Defendant to Third Parties through Defendant's Website's tracking technology without authorization.

151.    Excluded from the Classes are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers, and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

152.    Plaintiffs reserve the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

153.    This action satisfies the numerosity, commonality, typicality, and adequacy requirements under Fed. R. Civ. P. 23(a)(1)-(4).

154.    <u>Numerosity</u>: Class Members are so numerous and geographically dispersed that joinder of all members is impracticable. Upon information and belief, there likely millions of individuals throughout the United States whose Personal and Financial Information has been improperly used or disclosed by Defendant, and the Classes are identifiable within Defendant's records.

155.    <u>Ascertainability</u>. Class Members are readily identifiable from information in Defendant's possession, custody, and control.

156.    <u>Commonality and Predominance</u>: Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

a.    Whether Defendant disclosed Class Members' Personal and Financial Information to Third Parties;

b.    Whether Class Members consented to Defendant's disclosure of their Personal and Financial Information;

c.  Whether Defendant owed duties to Plaintiffs and Class Members to protect their Personal and Financial Information;

d.  Whether Defendant breached its duty to protect Plaintiffs' and Class Members' Personal and Financial Information;

e.  Whether Defendant's disclosure of Plaintiffs' and Class Members' Personal and Financial Information to Third Parties violated federal, state and local laws, or industry standards;

f.  Whether Defendant's failure to allow Customers a meaningful opportunity to opt out of sharing with Third Parties violated federal, state and local laws, or industry standards;

g.  Whether Defendant's conduct resulted in or was the actual cause of the disclosure of Plaintiffs' and Class Members' and Personal and Financial Information;

h.  Whether Defendant's conduct resulted in or was the proximate cause of the disclosure of Plaintiffs' and Class Members' Personal and Financial Information;

i.  Whether Defendant has a contractual obligation to protect Plaintiffs' and Class Members' Personal and Financial Information and whether it complied with such contractual obligation;

j.  Whether Defendant has a duty of confidence and whether it complied with such obligation;

k.  Whether Defendant's conduct amounted to violations of state consumer protection statutes;

l.  Whether Defendant's conduct amounted to violations of state and federal wiretap statutes;

m.  Whether Defendant's conduct amounted to violations of other California state laws;

n.  Whether Defendant should retain Plaintiffs' and Class Members' valuable Personal and Financial Information;

o.  Whether, as a result of Defendant's conduct, Plaintiffs and Class Members are entitled to injunctive, equitable, declaratory and/or other relief, and, if so, the nature of such relief.

157.  Defendant has engaged in a common course of conduct toward Plaintiffs and the Class Members, in that the Plaintiffs' and Class Members' data was stored on the same computer system and unlawfully disclosed and accessed in the same way. As set forth above, the common issues arising from Defendant's conduct affecting Class Members predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

158.  <u>Typicality</u>: Plaintiffs' claims are typical of those of other Class Members because all had their Personal and Financial Information compromised as a result of Defendant's use and incorporation of Meta Pixel, Google Pixel, Microsoft Pixel, and other tracking technology.

159.  <u>Policies Generally Applicable to the Classes</u>: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Classes as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly, and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Classes as a whole, not on facts or law applicable only to Plaintiffs.

160.  <u>Adequacy</u>: Plaintiffs will fairly and adequately represent and protect the interests

of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages Plaintiffs have suffered is typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intends to prosecute this action vigorously.

161.    <u>Superiority and Manageability</u>: Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

162.    The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged. If the class action device were not used, Defendant would necessarily gain an unconscionable advantage because it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources. Moreover, the costs of individual suits could unreasonably consume the amounts that would be recovered, whereas proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Classes and will

establish the right of each Class Member to recover on the cause of action alleged. Finally, individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

163.     The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

164.     Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

165.     Unless a Class-wide injunction is issued, Defendant may continue in its unlawful use and disclosure and failure to properly secure the Personal and Financial Information of Plaintiffs and the Class Members, Defendant may continue to refuse to provide proper notification to and obtain proper consent from Class Members, and Defendant may continue to act unlawfully as set forth in this Complaint.

166.     Moreover, Defendant has acted or refused to act on grounds generally applicable to the Classes, and, accordingly, final injunctive or corresponding declaratory relief regarding the whole of the Classes is appropriate.

167.     Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to the following:

 a. Whether Defendant owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Personal and Financial

Information;

b. Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Personal and Financial Information;

c. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to the disclosure of customer information;

d. Whether Defendant was negligent and/or negligent *per se*;

e. Whether an implied contract existed between Defendant on the one hand, and Plaintiffs and Class Members on the other, and the terms of that contract;

f. Whether Defendant breached the contract;

g. In the alternate, whether Defendant was unjustly enriched;

h. Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their Personal and Financial Information had been used and disclosed to Third Parties and used for Third Party and fourth parties' benefit;

i. Whether Defendant failed to implement and maintain reasonable security procedures and practices;

j. Whether Defendant invaded Plaintiffs and the Class Members' privacy;

k. Whether Defendant breached its implied duty of confidentiality; and,

l. Whether Plaintiffs and the Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

**COUNT I**
**NEGLIGENCE**
**(On Behalf of Plaintiffs, the Nationwide Class, and the California Subclass)**

168.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

169.    Plaintiffs and Class Members submitted sensitive nonpublic personal information, including Personal and Financial Information, when accessing Mr. Cooper's Website.

170.    Defendant owed to Plaintiffs and Class Members a duty to exercise reasonable care in handling and using Plaintiffs' and Class Members' Personal and Financial Information in its care and custody, including implementing industry-standard privacy procedures sufficient to reasonably protect the information from disclosure and unauthorized transmittal and use of Personal and Financial Information that occurred.

171.    Defendant's duties to keep the nonpublic personal information, including Personal and Financial Information, confidential also arose under the GLBA, which imposes "an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a).

172.    Defendant's duties to keep the nonpublic personal information, including Personal and Financial Information, confidential also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including the unfair practice of failing to keep the nonpublic personal information confidential.

173.    Defendant acted with wanton and reckless disregard for the privacy and confidentiality of Plaintiffs' and Class Members' Personal and Financial Information by disclosing and providing access to this information to Third Parties for the financial benefit of Third Parties (and fourth parties) and Defendant.

174.    Defendant owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's disclosure of their Personal

and Financial Information to benefit Third Parties (and fourth parties) and Defendant. Defendant actively sought and obtained Plaintiffs' and Class Members' Personal and Financial Information. And Defendant knew or should have known that by integrating tracking technology on its Website that Plaintiffs' and Class Members' nonpublic personal information, including Personal and Financial Information, would be disclosed to the Third Parties (and used by the fourth parties).

175.    Personal and Financial Information is highly valuable, and Defendant knew, or should have known, the harm that would be inflicted on Plaintiffs and Class Members by disclosing their Personal and Financial Information to Third Parties. This disclosure was of benefit to the Third Parties (and fourth parties) and Defendant by way of data harvesting, advertising, and increased sales.

176.    Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers in the handling and securing of Personal and Financial Information of Plaintiffs and Class Members. This failure actually and proximately caused Plaintiffs' and Class Members' injuries.

177.    As a direct, proximate, and traceable result of Defendant's negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or imminently will suffer injury and damages, including monetary damages, inappropriate advertisements and use of their Personal and Financial Information for advertising purposes, and increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

178.    Defendant's negligence and breach of its common-law duties to exercise reasonable care directly and proximately caused Plaintiffs' and Class Members' actual, tangible, injury-in-fact and damages, including, without limitation: the unauthorized access of their Personal and Financial Information by Third Parties (and fourth parties); improper disclosure of their Personal and

Financial Information; receipt of targeted advertisements reflecting private medical information; lost benefit of their bargain; lost value of their Personal and Financial Information and diminution in value; embarrassment, humiliation, frustration, and emotional distress; lost time and money incurred to mitigate and remediate the effects of use of their information, as to targeted advertisements that resulted from and were caused by Defendant's negligence; value to Plaintiffs and the Class Members of surrendering their choices to keep their Personal and Financial Information private and allowing Defendant to track their data; increased risk of future harm resulting from future use and disclosure of Plaintiffs' and the Class Members' Personal and Financial Information; and other injuries and damages as set forth herein. These injuries are ongoing, imminent, immediate, and continuing.

179.    Defendant's negligence directly and proximately caused the unauthorized access and disclosure of Plaintiffs' and Class Members' Personal and Financial Information, and as a result, Plaintiffs and Class Members have suffered and will continue to suffer damages as a result of Defendant's conduct. Plaintiffs and Class Members seek actual and compensatory damages, and all other relief they may be entitled to as a proximate result of Defendant's negligence.

180.    Plaintiffs and Class Members seek to recover the value of the unauthorized access to their Personal and Financial Information resulting from Defendant's wrongful conduct. This measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's personal information is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a Plaintiffs may generally recover the reasonable use value of the intellectual property—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's

use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such intellectual property to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiffs and Class Members have a protectible property interest in their Personal and Financial Information; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions

181.    Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

## COUNT II
## NEGLIGENCE *PER SE*
### (On Behalf of Plaintiffs, the Nationwide Class, and the California Subclass)

182.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

183.    Plaintiffs being this negligence *per se* count in the alternative to their common law negligence claim.

184.    Pursuant to the laws set forth herein, including the FTC Act, the GLBA, and state law, Defendant was required by law and industry standards to maintain adequate and reasonable data and cybersecurity measures to maintain the security and privacy of Plaintiffs' and Class Members' Personal and Financial Information.

185.    Plaintiffs and Class Members are within the class of persons that these statutes and rules were designed to protect.

186.    Defendant had a duty to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiffs' and Class Members' Personal and Financial Information.

187.    Defendant owed a duty to timely and adequately inform Plaintiffs and Class Members, in the event of their Personal and Financial Information being improperly disclosed to unauthorized Third Parties.

188.    It was not only reasonably foreseeable, but it was intended, that the failure to reasonably protect and secure Plaintiffs' and Class Members' Personal and Financial Information in compliance with applicable laws would result in unauthorized Third Parties gaining access to Plaintiffs' and Class Members' Personal and Financial Information, and resulting in Defendant's liability under principles of negligence *per se*.

189.    Defendant violated its duty under Section 5 of the FTC Act, the GLBA, and/or state law by failing to use reasonable measures to protect Plaintiffs' and Class Members' Personal and Financial Information and not complying with applicable industry standards as described in detail herein.

190.    Plaintiffs' and Class Member's Personal and Financial Information constitutes personal property that was taken and misused as a proximate result of Defendant's negligence, resulting in harm, injury and damages to Plaintiffs and Class Members.

191.    As a proximate result of Defendant's negligence *per se* and breach of duties as set forth above, Plaintiffs and Class Members were caused to, *inter alia*, have their data shared with Third Parties without their authorization or consent, receive unwanted advertisements that reveal seeking treatment for specific medical conditions, fear, anxiety and worry about the status of their Personal and Financial Information, diminution in the value of their personal data for which there is a tangible value, and/or a loss of control over their Personal and Financial Information, all of

which can constitute actionable actual damages.

192.    Defendant's conduct in violation of applicable laws directly and proximately caused the unauthorized access and disclosure of Plaintiffs' and Class Members' Personal and Financial Information, and as a result, Plaintiffs and Class Members have suffered and will continue to suffer damages as a result of Defendant's conduct. Plaintiffs and Class Members seek actual, and compensatory damages, and all other relief they may be entitled to as a proximate result of Defendant's negligence *per se*.

193.    Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

**COUNT III**
**VIOLATION OF THE COMPREHENSIVE COMPUTER DATA ACCESS**
**AND FRAUD ACT, CAL. PENAL CODE § 502**
**(On Behalf of Plaintiffs and the California Subclass)**

194.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

195.    The California Legislature enacted the Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502 to "expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems," and finding and declaring "that the proliferation of computer technology has resulted in a concomitant proliferation of computer crime and other forms of unauthorized access to computers, computer systems, and computer data." Cal. Penal Code § 502(a).

196.    In enacting the CDAFA, the Legislature further found and declared "that protection of the integrity of all types and forms of lawfully created computers, computer systems, and

computer data is vital to the protection of the privacy of individuals as well as to the well-being of financial institutions, business concerns, governmental agencies, and others within this state that lawfully utilize those computers, computer systems, and data." Cal. Penal Code § 502(a).

197.    Plaintiffs' and the Class Members' devices on which they accessed Defendant's Online Platforms and Websites, including their computers, smart phones, and tablets, constitute computers or "computer systems" within the meaning of CDAFA. Cal. Penal Code § 502(b)(5).

198.    By conduct complained of in the preceding paragraphs, Defendant violated Section 502(c)(1)(B) of CDAFA by knowingly accessing without permission Plaintiffs' and Class Members' devices in order to wrongfully obtain and use their personal data, including their Personal and Financial Information, in violation of Plaintiffs' and Class Members' reasonable expectations of privacy in their devices and data.

199.    Defendant violated Cal. Penal Code § 502(c)(2) by knowingly and without permission accessing, taking, copying, and using Plaintiffs' and the Class Members' Personal and Financial Information.

200.    Defendant used Plaintiffs' and Class Members' data as part of a scheme to defraud them and wrongfully obtain their data and other economic benefits. Specifically, Defendant intentionally concealed from Plaintiffs and Class Members that Defendant had secretly installed tracking pixels on its Online Platforms that surreptitiously shared Personal and Financial Information with third party advertising companies like Facebook. Had Plaintiffs and Class Members been aware of this practice, they would not have used Defendant's Website and Online Platforms.

201.    The computers and mobile devices that Plaintiffs and Class Members used when accessing Defendant's Website all have and operate "computer services" within the meaning of

CDAFA. Defendant violated § 502(c) of the CDAFA by knowingly and without permission accessing and using those devices and computer services, and/or causing them to be accessed and used, *inter alia*, in connection with the Third Parties' (and fourth parties') wrongful use of such data.

202.     Under § 502(b)(12) of the CDAFA a "Computer contaminant" is defined as "any set of computer instructions that are designed to . . . record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information."

203.     Defendant violated § 502(c)(8) by knowingly and without permission introducing a computer contaminant via trackers embedded into the Online Platforms which intercepted Plaintiffs' and the Class Members' private and sensitive financial information.

204.     Defendant's violation of the CDAFA caused Plaintiffs and Class Members, at minimum, the following damages:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendant eroded the essential confidential nature of their relationship;

c. Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value;

d. Plaintiffs and Class Members did not get the full value of the financial services for which they paid, which included Defendant's duty to maintain confidentiality; and

e. Defendant's actions diminished the value of Plaintiffs' and Class Members' Private Information.

205.    Plaintiffs and the Class Members seek compensatory damages in accordance with Cal. Penal Code § 502(e)(1), in an amount to be proved at trial, and injunctive or other equitable relief; as well as punitive or exemplary damages pursuant to Cal. Penal Code § 502(e)(4) as Defendant's violations were willful and, upon information and belief, Defendant is guilty of oppression, fraud, or malice as defined in Cal. Civil Code § 3294; and reasonable attorney's fees under § 502(e)(2).

206.    Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT IV**
**VIOLATION OF CALIFORNIA'S CONSUMER PROTECTION LAW ("UCL"), CAL. BUS. & PROF. CODE §§ 17200, *et seq*.**
**(On Behalf of Plaintiff Beltran, Plaintiff Ayers, and the California subclass)**

207.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

208.    Plaintiffs and Defendant are each a "person" under Cal. Bus. & Prof. Code § 17201.

209.    The California Business and Professions Code §§ 17201, *et seq*. prohibits acts of unfair competition, which includes unlawful business practices.

210.    Defendant's business acts and practices are "unlawful" under the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et. seq.* (the "UCL") because, as alleged above, Defendant violated California common law, and other statutes and causes of action alleged herein.

211.    Defendant engaged in unlawful acts and practices by imbedding the Pixel on its Websites, which tracks, records, and transmits Plaintiffs' and Class Members' Personal and Financial Information they disclose to Defendant in confidence its Website to Third Parties without Plaintiffs' and Class Members' knowledge and/or consent, in violation of the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*.; the Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502; and by representing that their services have characteristics, uses,

or benefits that they do not have in violation of Civil Code § 1770.

212.    When using Defendant's Website and services, Plaintiffs and Class Members relied on Defendant's status as a trusted financial institution.

213.    Inconsistent with its role as a financial service provider, Defendant disclosed Plaintiffs' and Class Members' Personal and Financial Information to Third Parties without their consent and for marketing purposes. Thus, Defendant represented that its services have characteristics, uses, or benefits that they do not have and represented that its services are of a particular standard, quality, or grade when they were not, in violation of Cal. Civil Code § 1770.

214.    Plaintiffs and Class Members were reasonable to assume, and did assume, that Defendant would take appropriate measures to keep their Personal and Financial Information secure and not share it with Third Parties or allow Third Parties (and fourth parties) to use it without their express consent.  Defendant also had a duty to disclose that it was sharing their Customers' Personal and Financial Information with Third Parties. However, Defendant did not disclose at any time that it was sharing this Personal and Financial Information with Third Parties via tracking technologies or that Third Parties (and fourth parties) were using their Personal and Financial Information.

215.    Had Plaintiffs and Class Members known that Defendant would intercept, collect, and transmit their Personal and Financial Information to Third Parties, Plaintiffs and the Class Members would not have used Defendant's services.

216.    Plaintiffs and Class Members have a property interest in their Personal and Financial Information. By surreptitiously collecting and otherwise misusing Plaintiffs' and Class Members' Personal and Financial Information, Defendant has taken property from Plaintiffs and Class Members without providing just (or indeed any) compensation.

217. By deceptively collecting, using, and sharing Plaintiffs' and Class Members' Personal and Financial Information with Third Parties for Third Party (and fourth parties) use, Defendant has taken money or property from Plaintiffs and Class Members. Accordingly, Plaintiffs seek restitution on behalf of themselves and the Class.

218. Defendant's business acts and practices also meet the unfairness prong of the UCL according to all three theories of unfairness.

219. First, Defendant's business acts and practices are "unfair" under the UCL pursuant to the three-part test articulated in *Camacho v. Automobile Club of Southern California* (2006) 142 Cal. App. 4th 1394, 1403: (a) Plaintiffs and Class Members suffered substantial injury due to Defendant's Disclosure of their Personal and Financial Information; (b) Defendant's disclosure of Plaintiffs' and Class Members' Personal and Financial Information provides no benefit to Customers, let alone any countervailing benefit that could justify Defendant's Disclosure of Personal and Financial Information without consent for marketing purposes or other pecuniary gain; and (c) Plaintiffs and Class Members could not have readily avoided this injury because they had no way of knowing that Defendant was implementing tracking technology.

220. Second, Defendant's business acts and practices are "unfair" under the UCL because they are "immoral, unethical, oppressive, unscrupulous, or substantially injurious" to Plaintiffs and Class Members, and "the utility of [Defendant's] conduct," if any, does not "outweigh the gravity of the harm" to Plaintiffs and Class Members. *Drum v. San Fernando Valley Bar Ass'n,* (2010) 182 Cal. App. 4th 247, 257. Defendant secretly collected, disclosed, and otherwise misused Plaintiffs' and Class Members' Personal and Financial Information by bartering it to Third Parties in return for marketing and profit. This surreptitious, willful, and undisclosed conduct is immoral, unethical, oppressive, unscrupulous, and substantially injurious. Moreover,

no benefit inheres in this conduct, the gravity of which is significant.

221.    Third, Defendant's business acts and practices are "unfair" under the UCL because they run afoul of "specific constitutional, statutory, or regulatory provisions." *Drum*, 182 Cal. App. 4th at 256 (internal quotation marks and citations omitted). California has a strong public policy of protecting consumers' privacy interests, including consumers' personal data, as codified in California's Constitution in Article I, section 1; the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*.; and the CDAFA, Cal. Penal Code § 502, among other statutes.

222.    Defendant violated this public policy by, among other things, surreptitiously collecting, disclosing, and otherwise exploiting Plaintiffs' and Class Members' Personal and Financial Information by sharing that information with Third Parties via tracking technologies without Plaintiffs' and/or Class Members' consent.

223.    Had Plaintiffs and Class Members known Defendant would intercept, collect, and transmit their Personal and Financial Information to Facebook and other Third Parties, Plaintiffs and Class Members would not have used Defendant's services.

224.    Plaintiffs and Class Members were reasonable to assume, and did assume, that Defendant would take appropriate measures to keep their Personal and Financial Information secure and not share it with Third Parties without their express consent. Defendant was in sole possession of and had a duty to disclose the material information that Plaintiffs' and Class Members' Personal and Financial Information would be shared with Third Parties via trackers. Defendant did not disclose at any time that they were sharing this Personal and Financial Information with Third Parties via trackers.

225.    Plaintiffs and Class Members have a property interest in their Personal and Financial Information. By surreptitiously collecting and otherwise misusing Plaintiffs' and Class

Members' Personal and Financial Information, Defendant has taken property from Plaintiffs and Class Members without providing just (or indeed any) compensation.

226. Plaintiffs and Class Members have lost money and property due to Defendant's conduct in violation of the UCL. Personal and Financial Information such as that which Defendant collected and transmitted to Third Parties has objective monetary value. Companies are willing to pay for Personal and Financial Information, like the information Defendant unlawfully collected and transmitted to Third Parties. For example, Pfizer annually pays approximately $12 million to purchase similarly sensitive information on health data, from various sources.[63]

227. By deceptively collecting, using, and sharing Plaintiffs' and Class Members' Personal and Financial Information with Third Parties, and by allowing Third Parties (and fourth parties) to use their Personal and Financial Information, Defendant has taken money and/or property from Plaintiffs and Class Members. Accordingly, Plaintiffs seek restitution on behalf of themselves and the Class.

228. As a direct and proximate result of Defendant's unfair and unlawful methods and practices of competition, Plaintiffs and Class Members suffered actual damages, including, but not limited to, the loss of the value of their Personal and Financial Information.

229. As a direct and proximate result of its unfair and unlawful business practices, Defendant has each been unjustly enriched and should be required to make restitution to Plaintiffs and Class Members pursuant to §§ 17203 and 17204 of the California Business & Professions Code, disgorgement of all profits accruing to Defendant because of its unlawful and unfair business practices, declaratory relief, attorney fees and costs (pursuant to Cal. Code Civ. Proc. §1021.5),

---

[63] SciAm, *How Data Brokers Make Money Off Your Medical Records*, https://www.scientificamerican.com/article/how-data-brokers-make-money-off-your-medical-records/.

and injunctive or other equitable relief.

## COUNT V
### VIOLATION OF CALIFORNIA CONSUMER PRIVACY ACT,
### Cal. Civ. Code § 1798.100, *et seq.*
### (On Behalf of Plaintiff Beltran, Plaintiff Ayers, and the California subclass)

230.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

231.    The CCPA grants consumers rights, including the right to know what personal information is being collected about them and whether that information is sold or disclosed and to whom, the right to prohibit the sale of their personal information, the right to request deletion of their personal information, and the right to nondiscrimination in service and price when they exercise privacy rights. Cal. Civ. Code § 1798.100, *et seq.*

232.    The CCPA dictates specifically that "[a] third party shall not sell or share personal information about a consumer that has been sold to, or shared with, the third party by a business unless the consumer has received explicit notice and is provided an opportunity to exercise the right to opt-out." Cal. Civ. Code § 1798.115 (emphasis added).

233.    Defendant collected Plaintiffs' and Class Members Personal and Financial Information, including their personal information, with the purpose of providing financial services in the course of and as part of its business in California.

234.    Disclosing Plaintiffs' and Class Members' Personal and Financial Information to Third Parties was not reasonably necessary or proportionate to perform the reasonably expected financial services that they applied for or received.

235.    By collecting, using, and selling Plaintiffs' and Class Members' personal information and location data to Third Parties for Third Party (and fourth party) use, all without providing consumers with notice, Defendant violated the CCPA.

236.    By failing to inform Customers like Plaintiffs and Class Members of the personal

information collected about them and the Third Parties with whom that personal information was shared, and the Third Parties' (and fourth parties') use of that personal information, Defendant violated the CCPA.

237. By failing to abide by Customers' requests to delete collected personal information, Defendant violated the CCPA.

238. Pursuant to Cal. Civ. Code § 1798.150(b), Plaintiffs will send Defendant notice of their CCPA claims shortly after the date of this filing. If Defendant does not correct its business practices, Plaintiffs will amend (or seek leave to amend) the complaint to add claims for monetary relief, including statutory and actual damages under the CCPA. To date, Defendant has failed to cure the CCPA violation.

239. As a result of Defendant's reckless violations, Plaintiffs are entitled to actual damages, statutory damages, and attorneys' fees and costs. Cal. Civ. Code § 1798.150.

**COUNT VI**
**BREACH OF EXPRESS AND IMPLIED CONTRACT**
**(On Behalf of Plaintiffs, the Nationwide Class, and the California Subclass)**

240. Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

241. Plaintiffs and Class Members also entered into an express and implied contract with Mr. Cooper when they obtained financial services from Mr. Cooper, or otherwise provided nonpublic personal information, including Personal and Financial Information, to Mr. Cooper.

242. As part of these transactions, Mr. Cooper explicitly and implicitly agreed to safeguard and protect Plaintiffs' and Class Members' Personal and Financial Information.

243. Plaintiffs and Class Members entered into express and implied contracts with the reasonable expectation (based on Mr. Cooper's own express and implied promises) that Mr.

63
CLASS ACTION COMPLAINT

Cooper would keep their nonpublic personal information, including Personal and Financial Information, confidential. Plaintiffs and Class Members believed that Mr. Cooper would use part of the monies paid to Mr. Cooper under the express and implied contracts to keep their nonpublic personal information, including Personal and Financial Information, confidential.

244.    Plaintiffs and Class Members would not have provided and entrusted their nonpublic personal information, including Personal and Financial Information, or would have paid less for Mr. Cooper's services in the absence of the express and implied contract or implied terms between them and Mr. Cooper. The safeguarding of the nonpublic personal information, including Personal and Financial Information, of Plaintiffs and class members was critical to realize the intent of the parties.

245.    As extensively detailed above, Mr. Cooper breached its express and implied contracts with Plaintiffs and class members to protect their nonpublic personal information, including Personal and Financial Information, when it disclosed that information to Third Parties.

246.    As a direct and proximate result of Mr. Cooper's breach of express and implied contract, Plaintiffs and Class Members sustained actual losses and damages as described in detail above.

## COUNT VII
### UNJUST ENRICHMENT (AS ALTERNATIVE TO CONTRACT CLAIMS)
### (On Behalf of Plaintiffs, the Nationwide Class, and the California Subclass)

247.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

248.    Plaintiffs and Class Members have an interest, both equitable and legal and financial, in their Personal and Financial Information, that was conferred upon, collected by, and maintained by Defendant and that was ultimately disclosed without their consent.

249.    Plaintiffs and Class Members conferred a monetary benefit upon Defendant in the form of valuable, sensitive, personal, and financial information—Personal and Financial Information—that Defendant collected from Plaintiffs and Class Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain, for marketing purposes, and for sale or trade with Third Parties. Defendant did not share this benefit with Plaintiffs and Class Members.

250.    Plaintiffs and Class Members would not have used Defendant's services, or would have paid less for those services, if they had known that Defendant would collect, use, and disclose their Personal and Financial Information to Third Parties or allow Third Parties (and fourth parties) to use their Personal and Financial Information.

251.    Defendant appreciated or had knowledge of the benefits conferred upon it by Plaintiffs and Class Members.

252.    The benefits that Defendant derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members themselves. Under unjust enrichment principles, it would be inequitable for Defendant to retain the profit and/or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

253.    Defendant continues to benefit and profit from its retention and use of Plaintiffs' and Class Members' Personal and Financial Information, while its value to Plaintiffs and Class Members has been diminished.

254.    Plaintiffs pleads this claim separately as well as in the alternative to claims for damages under Fed. R. Civ. P. 8(a)(3), because if the Court dismisses Plaintiffs' claims for damages or enters judgment on them in favor of the Defendant, Plaintiffs' will have no adequate legal remedy. Plaintiffs make the following allegations in this paragraph only hypothetically and as an

alternative to any contrary allegations in her other causes of action, in the event that such causes of action do not succeed. Plaintiffs and the Class Members may be unable to obtain monetary, declaratory and/or injunctive relief directly under other causes of action, and, if so, will lack an adequate remedy at law.

255.    Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds it received as a result of the conduct and the unauthorized Disclosure alleged herein

**COUNT VIII**
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiff Ayers, Plaintiff Beltran, the Nationwide Class, and the California Subclass)**

256.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

257.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, the Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this complaint.

258.    An actual controversy has arisen regarding Mr. Cooper's present and prospective common law and other duties to keep its Customers' Personal and Financial Information confidential and whether Defendant is currently keeping that information confidential. Plaintiffs like Ayers and Beltran remain Mr. Cooper Customers who need to use Mr. Cooper's Website to manage their accounts and mortgages with Mr. Cooper. Plaintiffs Ayers and Beltran and similar Class Members thus remain at imminent risk that additional disclosure of their Personal and Financial Information will occur in the future.

259.    Pursuant to its authority under the Declaratory Judgment Act, this Court should

66
CLASS ACTION COMPLAINT

enter a judgment declaring, among other things, the following:

    a.   Defendant continues to owe a legal duty to secure Customers' Personal and Financial Information, under the common law, Section 5 of the FTC Act, the GLBA, and various state statutes;

    b.   Defendant continues to breach this legal duty by disclosing its Customers' Personal and Financial Information to unaffiliated Third Parties.

260.    The Court also should issue corresponding prospective injunctive relief requiring Defendant to keep its nonpublic personal information, including Personal and Financial Information, confidential consistent with law and industry standards.

261.    If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury, and lack an adequate legal remedy. The risk of additional disclosure is real, immediate, and substantial as trackers remain operative on Defendant's website to this day. If additional disclosure occurs, Plaintiffs and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

262.    The hardship to Plaintiffs and Class Members if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Among other things, if Mr. Cooper continues to disclose its Customers' Personal and Financial Information, Plaintiffs and Class Members will likely be subjected to the harms described herein. On the other hand, the cost to Defendant of complying with an injunction by keeping its Customers' Personal and Financial Information, confidential is relatively minimal (for example, removing trackers from its website), and Defendant has a pre-existing legal obligation to do so.

263.    Issuance of the requested injunction will not disserve the public interest. To the

contrary, such an injunction would benefit the public by preventing Mr. Cooper's additional unlawful disclosures of Customers' Personal and Financial Information, thus eliminating the additional injuries that would result to Plaintiffs and the hundreds of thousands of Customers whose information has been and will continue to be disclosed.

**COUNT IX**
**BREACH OF CONFIDENCE**
**(On Behalf of Plaintiffs, the Nationwide Class, and the California Subclass)**

264.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

265.    At all times during Plaintiffs' and Class Members' interactions with Mr. Cooper, Mr. Cooper was fully aware of the confidential and sensitive nature of Plaintiffs' and Class Members' Personal and Financial Information.

266.    As alleged herein and above, Mr. Cooper's relationship with Plaintiffs and Class Members was governed by terms and expectations that Plaintiffs' and Class Members' Personal and Financial Information, would be collected, stored, and protected in confidence, and would not be disclosed to Third Parties, or used by Third Parties (and fourth parties) without notice and consent.

267.    Plaintiffs and Class Members provided Mr. Cooper with their Personal and Financial Information, with the explicit and implicit understandings that Mr. Cooper would protect and not permit that information to be disseminated to and used by unaffiliated Third Parties (and fourth parties) without notice, consent, and sufficient opportunity to opt out.

268.    Mr. Cooper voluntarily received in confidence Plaintiffs' and Class Members' Personal and Financial Information, with the understanding and affirmative representation to Customers that the information would not be disclosed or disseminated to unaffiliated Third Parties for Third Parties' (and fourth parties') marketing purposes.

269.    Mr. Cooper disclosed Plaintiffs' and Class Members' Personal and Financial Information, without notice, without express permission, and without opportunity to opt out.

270.    But for Mr. Cooper's Disclosure of Plaintiffs' and Class Members' Personal and Financial Information, in violation of the parties' understanding of confidence, their Personal and Financial Information would not have been disclosed to Third Parties, or used for Third Party (and fourth party) marketing and profit, without their consent.

271.    The injury and harm Plaintiffs and Class Members suffered was the reasonably foreseeable result of Mr. Cooper's nonconsensual disclosure of Plaintiffs' and Class Members' Personal and Financial Information. Mr. Cooper knew it was disclosing Plaintiffs' and Class Members' Personal and Financial Information to Third Parties, for Third Party (and fourth party) use, without their consent.

272.    As a direct and proximate result of Mr. Cooper's breaches of confidence, Plaintiffs and Class Members have been injured and are entitled to damages in an amount to be proven at trial.

273.    Plaintiffs seek all monetary and non-monetary relief allowed by law.

### COUNT X
### VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT, CAL. PENAL CODE §§ 630, *et seq.*
### (On Behalf of Plaintiff Beltran, Plaintiff Ayers, and the California subclass)

274.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

275.    The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*. declaring that:

> advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

The Legislature by this chapter intends to protect the right of privacy of the people of this state.

Cal. Penal Code § 630.

276.    Cal. Penal Code § 631(a) prohibits persons from "aid[ing], agree[ing] with, employ[ing], or conspir[ing] with" a third party to "read[], or attempt[] to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained" "by means of any machine, instrument, or contrivance, or in any other manner…" Cal. Penal Code § 631(a).

277.    Cal. Penal Code § 632(a) prohibits persons from intentionally recording confidential communications without consent of all parties to the communication.

278.    All alleged communications between individual Plaintiffs or Class Members and Defendant qualify as protected communications under CIPA because each communication is made using personal computing devices (e.g., computers, smartphones, tablets) that send and receive communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

279.    As alleged in the preceding paragraphs, by use of tracking technology, Defendant used a recording device to record the confidential communications including Personal and Financial Information without the consent of Plaintiffs or Class Members and then transmitted such information to Third Parties for Third Party (and fourth party) use.

280.    At all relevant times, Defendant's aiding of Third Parties to learn the contents of communications and Defendant's recording of confidential communications was without

Plaintiffs' and the Class Members' authorization and consent.

281.    Plaintiffs and Class Members had a reasonable expectation of privacy regarding the confidentiality of their communications with Defendant. Defendant had duties under statutory and common law to safeguard its Customers' Personal and Financial Information, and not disclose it without authorization. Defendant never received any authorization and disclosed Plaintiffs' and the Class's Personal and Financial Information regardless.

282.    Defendant engaged in and continued to engage in interception by aiding others (including Facebook) to secretly record the contents of Plaintiffs' and Class Members' wire communications.

283.    The intercepting devices used in this case include, but are not limited to:

a.  Those to which Plaintiffs' and Class Members' communications were disclosed;

b.  Plaintiffs' and Class Members' personal computing devices;

c.  Plaintiffs' and Class Members' web browsers;

d.  Plaintiffs' and Class Members' browser-managed files;

e.  Trackers like the Meta Pixel;

f.  Internet cookies;

g.  Other pixels, trackers, and/or tracking technology installed on Defendant's Website and/or server;

h.  Defendant's computer servers;

i.  Third Party source code utilized by Defendant; and

j.  Third Party computer servers (including Facebook).

284.    Defendant aided in the interception of contents in that the data from the communications between Plaintiffs and/or Class Members and Defendant that were redirected to

and recorded by the Third Parties include information which identifies the parties to each communication, their existence, and their contents.

285.    Plaintiffs and Class Members reasonably expected that their Personal and Financial Information was not being intercepted, recorded, and disclosed to Third Parties or used by Third Parties (and fourth parties) for marketing and profit.

286.    No legitimate purpose was served by Defendant's willful and intentional disclosure of Plaintiffs' and Class Members' Personal and Financial Information to Third Parties. Neither Plaintiffs nor Class Members consented to the disclosure of their Personal and Financial Information by Defendant to Third Parties or the use of the Personal and Financial Information by Third Parties (and fourth parties).

287.    The trackers that Defendant utilized are designed such that they transmitted each of a website user's actions to Third Parties alongside and contemporaneously with the user initiating the communication. Thus, Plaintiffs' and Class Members' communications were intercepted in transit to the intended recipient (Defendant) before they reached Defendant's servers.

288.    Defendant willingly facilitated the Third Parties' interception and collection of Plaintiffs' and Class Members' Personal and Financial Information, and the Third Parties' (and fourth parties') use of their Personal and Financial Information, by embedding trackers on its Website.  Moreover, Defendant had full control over these trackers, including which webpages contained the pixels, what information was tracked and shared, and how events were categorized prior to transmission.

289.    Defendant gave substantial assistance to Third Parties in violating the privacy rights of Mr. Cooper's Customers, even though Defendant's conduct constituted a breach of the confidentiality duties that it owed, including the duty financial institutions owe to their customers

and customers' property. Defendant knew that the installation of trackers on its website would result in the unauthorized disclosure of its Customers' communications to Third Parties, and Third Party (and fourth party) use of those communications, yet nevertheless did so anyway.

290.    Plaintiffs' and Class Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of monetizing their Personal and Financial Information, including using their Personal and Financial Information to develop marketing and advertising strategies.

291.    The Personal and Financial Information that Defendant assisted Third Parties with reading, learning, and exploiting, included Plaintiffs' and Class Members' Personal and Financial Information customers input into and accessed on Mr. Cooper's Website. Mr. Cooper disclosed details about Customers, like Plaintiffs and Class Personal and Financial Information and their interactions with Mr. Cooper's website as users applied for or managed their mortgages, including the fact that a user was on a certain page, that users clicked buttons and what URLs or webpages they led to, the Customer's refinancing options and the user's selections, the state in which the property was located, type of property, and the reason the customer was seeking to refinance.

292.    Plaintiffs and the Class Members seek statutory damages under Cal. Penal Code § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the Classes in an amount to be proven at trial, as well as injunctive or other equitable relief.

293.    In addition to statutory damages, Defendant's violations caused Plaintiffs and Class Members the following damages.

   a.    Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private.

b. Defendant eroded the essential confidential nature of the mortgagee-mortgagor relationship.

c. Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value;

d. Plaintiffs and Class Members did not get the full value of the financial services for which they paid, which included Defendant's duty to maintain confidentiality; and

e. Defendant's actions diminished the value of Plaintiffs' and Class Members' Personal and Financial Information.

294.    Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT XI**
**VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")**
**18 U.S.C. §§ 2511(1), *et seq.***
**(On Behalf of Plaintiffs, the Nationwide Class, and the California Subclass)**

295.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

296.    The ECPA protects both sending and receipt of communications. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

297.    The transmissions of Plaintiffs' and Class Members' Personal and Financial Information to Defendant's Website qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

298.    **Electronic Communications**. The transmission of Personal and Financial Information between Plaintiffs and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and]

74
CLASS ACTION COMPLAINT

intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

299.    **Content**. The ECPA defines content, when used with respect to electronic communications, to "include [] any information concerning the substance, purport, or meaning of that communication." *See* 18 U.S.C. § 2510(8).

300.    **Interception**. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents…include any information concerning the substance, purport, or meaning of that communication." *See* 18 U.S.C. § 2510(4), (8).

301.    **Electronic, Mechanical or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a.   Plaintiffs' and Class Members' browsers;

b.   Plaintiffs' and Class Members' computing devices;

c.   Defendant's web-servers;

d.   Defendant's Website; and

e.   The tracking technology deployed by Defendant effectuated the sending and acquisition of customer communications.

302.    By utilizing and embedding the tracking technology on its Website, Defendant intentionally intercepted, endeavored to intercept and procured another person to intercept the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

303.    Specifically, Defendant intercepted Plaintiffs' and Class Members' electronic communications via the tracking technology which tracked, stored, and unlawfully disclosed Plaintiffs' and Class Members' Personal and Financial Information to Third Parties.

304.    Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiffs and Class Members regarding Personal and Financial Information.

305.    By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class Members to Third Parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

306.    By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

307.    **Unauthorized Purpose.** Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State – namely, invasion of privacy, among others.

308.    Defendant intentionally used the wire or electronic communications to increase its profit margins and save on marketing costs.

309.    Defendant specifically used tracking technology to track and to utilize Plaintiffs' and Class Members' Personal and Financial Information for financial gain.

310.    Defendant was not acting under color of law to intercept Plaintiffs' and Class

Members' wire or electronic communication.

311.    Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiffs' and Class Members' privacy via the tracking technology.

312.    In sending and in acquiring the content of Plaintiffs' and Class Members' communications relating to the browsing of its Website, Defendant's purpose was tortious, criminal and designed to violate federal and state legal provisions, including as described above the following: (i) a knowing intrusion into a private, place, conversation or matter that would be highly offensive to a reasonable person; and (ii) violation of GLBA, the FTC Act, invading Plaintiffs' and Class Members' privacy, and in breach of its fiduciary duty of confidentiality.

**COUNT XII**
**VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**18 U.S.C. § 2511(3)(a)**
**UNAUTHORIZED DIVULGENCE BY ELECTRONIC COMMUNICATIONS SERVICE**
**(On Behalf of Plaintiffs, the Nationwide Class, and the California Subclass)**

313.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

314.    The ECPA statute provides that "a person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication (other than one to such person or entity, or an agent thereof) while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication or an agent of such addressee or intended recipient." 18 U.S.C. § 2511(3)(a).

315.    **Electronic Communication Service**. An "electronic communication service" is defined as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15). Defendant's Website is an electronic communication service which provides to users thereof, customers of Defendant, the ability to

send or receive electronic communications; in the absence of Defendant's Website, internet users could not send or receive communications regarding Plaintiffs' and Class Members' Personal and Financial Information.

316.   **Intentional Divulgence**. Defendant intentionally designed the tracking technology and was or should have been aware that, if so configured, it could divulge Plaintiffs' and Class Members' Personal and Financial Information. Upon information and belief, Defendant's divulgence of the contents of Plaintiffs' and Class Members' communications was contemporaneous with their exchange with Defendant's Website, to which they directed their communications.

317.   Defendant divulged the contents of Plaintiffs' and Class Members' electronic communications without authorization and/or consent.

318.   **Exceptions do not apply**. In addition to the exception for communications directly to an electronic communications service ("ECS")[64] or an agent of an ECS, the ECPA states that

> [a] person or entity providing electronic communication service to the public may divulge the contents of any such communication"..."as otherwise authorized in section 2511(2)(a) or 2517 of this title; "with the lawful consent of the originator or any addressee or intended recipient of such communication;" c. "to a person employed or authorized, or whose facilities are used, to forward such communication to its destination;" or d. "which were inadvertently obtained by the service provider and which appear to pertain to the commission of a crime, if such divulgence is made to a law enforcement agency.

U.S.C. § 2511(3)(b).

319.   Section 2511(2)(a)(i) provides:

> It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of a provider of wire or electronic communication service, whose facilities are used in the transmission of a wire or electronic communication, to intercept, disclose, or use that communication in the normal

---

[64] An ECS is "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the provider of that service, except that a provider of wire communication service to the public shall not utilize service observing or random monitoring except for mechanical or service quality control checks.

320.    Defendant's divulgence of the contents of Plaintiffs' and Class Members' communications to Facebook, Google, and Microsoft was not authorized by 18 U.S.C. § 2511(2)(a)(i) in that it was neither: (i) a necessary incident to the rendition of Defendant's service nor (ii) necessary to the protection of the rights or property of Defendant.

321.    Section 2517 of the ECPA relates to investigations by government officials and has no relevance here.

322.    Defendant's divulgence of the contents of Plaintiffs' and the Class Members' communications on its Website through the tracking technology was not done "with the lawful consent of the originator or any addresses or intended recipient of such communication[s]." As alleged above: (i) Plaintiffs and Class Members did not authorize Defendant to divulge the contents of their communications and (ii) Defendant did not procure the "lawful consent" from the websites or apps with which Plaintiffs and Class Members were exchanging information.

323.    Moreover, Defendant divulged the contents of Plaintiffs' and Class Members' communications through tracking technology to individuals who are not "person[s] employed or whose facilities are used to forward such communication to its destination."

324.    The contents of Plaintiffs' and Class Members' communications did not appear to pertain to the commission of a crime and Defendant did not divulge the contents of their communications to a law enforcement agency.

325.    As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may assess statutory damages, preliminary and other equitable or declaratory relief as may be

appropriate, punitive damages in an amount to be determined by a jury and a reasonable attorney's fee and other litigation costs reasonably incurred.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, pray for judgment as follows:

A.  For an Order certifying this action as a Class action and appointing Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

B.  For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

C.  For an award of punitive damages, as allowable by law;

D.  For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' Personal and Financial Information and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

E.  For an Order declaring the rights and obligations of the parties, including, without limitation, that Defendant owes a legal duty to its Customers to secure their Personal and Financial Information and that Defendant violates this legal duty by disclosing its Customers' Personal and Financial Information to unaffiliated Third Parties;

F.  For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety and to disclose with specificity the type of Personal and Financial Information compromised and unlawfully disclosed to Third Parties;

G.    For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

H.    For an Order compelling Defendant to pay for not less than three years of credit monitoring services for Plaintiffs and the Classes;

I.    For an award of reasonable attorneys' fees and costs under the laws outlined above, the common fund doctrine, and any other applicable law;

J.    Costs and any other expenses, including expert witness fees incurred by Plaintiffs in connection with this action;

K.    Pre- and post-judgment interest on any amounts awarded; and

L.    Such other and further relief as this court may deem just and proper.

### JURY DEMAND

Plaintiffs, individually and on behalf of all others similarly situated, hereby demand a trial by jury on all issues so triable.

Dated: May 23, 2025                         Respectfully submitted,

_____

Natalie Lyons, No. 293026
Vess A. Miller, No. 278020
Lynn A. Toops*
Lisa M. La Fornara*
COHENMALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
(317) 636-6481
nlyons@cohenmalad.com
vmiller@cohenmalad.com
ltoops@cohenmalad.com
llafornara@cohenmalad.com

J. Gerard Stranch, IV*
Emily E. Schiller*

81
CLASS ACTION COMPLAINT

STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
(615) 254-8801
(615) 255-5419 (facsimile)
gstranch@stranchlaw.com
eschiller@stranchlaw.com

Samuel J. Strauss*
Raina C. Borrelli*
STRAUSS BORRELLI, PLLC
980 N. Michigan Avenue, Suite 1610
Chicago, Illinois 60611
(872) 263-1100
(872) 263-1109 (facsimile)
sam@straussborrelli.com
raina@straussborrelli.com

*To seek admission *pro hac vice*

***Counsel for Plaintiffs and the Proposed Classes***