Natalie Lyons, No. 293026
Vess A. Miller, No. 278020
COHENMALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
Tel: (317) 636-6481
nlyons@cohenmalad.com
vmiller@cohenmalad.com

*To move for *pro hac vice* admission
[*additional counsel listed on signature pages*]

**Counsel for Plaintiff and the Proposed Class**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| **MARTIN BELTRAN, individually and on behalf of all others similarly situated,**<br><br>**Plaintiffs**<br><br>v.<br><br>**NATIONSTAR MORTGAGE LLC d/b/a MR. COOPER,**<br><br>**Defendant.** | **Civil Action No. 3:25-cv-04412-JSC**<br><br>**PLAINTIFF'S OPPOSITION TO MR. COOPER'S MOTION TO TRANSFER VENUE**<br><br><br>**DEMAND FOR JURY TRIAL** |

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

FACTUAL & PROCEDURAL BACKGROUND .............................................................. 1

ARGUMENT ........................................................................................................................ 2

    I.    Standard of Review ............................................................................................. 3

    II.   Sign-In Wrap ....................................................................................................... 3

    III.  1404(a) Analysis ............................................................................................... 12

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Applebaum v. Lyft, Inc.*,
    263 F. Supp. 3d 454 (S.D.N.Y. 2017)..................................................................................10

*Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*,
    571 U.S. 49 (2013)..................................................................................................................3

*Bender v. Twilio Inc.*,
    No. 24-CV-04914-AMO, 2025 WL 2308484 (N.D. Cal. Aug. 11, 2025)..............................11

*Berman v. Freedom Fin. Network, LLC*,
    30 F.4th 849 (9th Cir. 2022) .................................................................................................10

*Calhoun v. Google, LLC*,
    113 F.4th 1141 (9th Cir. 2024) .............................................................................................10

*Capps v. JPMorgan Chase Bank, N.A.*,
    No. 2:22-CV-00806-DAD-JDP, 2023 WL 3030990 (E.D. Cal. Apr. 21, 2023) ....................11

*Chabolla v. ClassPass Inc.*,
    129 F.4th 1147 (9th Cir. 2025) ............................................................................................6, 8

*E. & J. Gallo Winery v. F. & P. S.p.A.*,
    899 F. Supp. 465 (E.D. Cal. 1994).........................................................................................12

*Godun v. JustAnswer LLC*,
    135 F.4th 699 (9th Cir. 2025) .................................................................................................9

*Jones v. GNC Franchising, Inc.*,
    211 F.3d 495 (9th Cir. 2000) ............................................................................................3, 12

*Keebaugh v. Warner Bros. Ent. Inc.*,
    100 F.4th 1005 (9th Cir. 2024) ...............................................................................................3

*Kuhk v. Playstudios Inc.*,
    No. 2:24-CV-00460-TL, 2024 WL 4529263 (W.D. Wash. Oct. 18, 2024)............................11

*Lee v. Plex, Inc.*,
    773 F. Supp. 3d 755 (N.D. Cal. 2025) .......................................................................3, 4, 5, 8

*Lee v. Ticketmaster L.L.C.*,
    817 F. App'x 393 (9th Cir. 2020) ..........................................................................................11

*Nguyen v. Barnes & Noble Inc.*,
    763 F.3d 1171 (9th Cir. 2014) .................................................................................................10

*Phillips v. Neutron Holdings, Inc.*,
    No. 3:18-CV-3382-S, 2019 WL 4861435 (N.D. Tex. Oct. 2, 2019) .......................................11

*Sellers v. JustAnswer LLC*,
    73 Cal.App.5th 444, 289 Cal. Rptr. 3d 1 (2021).......................................................................6

*Seneca v. Homeaglow, Inc.*,
    No. 8:23-CV-02308-CJC-ADS, 2024 WL 750029 (C.D. Cal. Feb. 7, 2024)............................7

*Serrano v. Open Rd. Delivery Holdings, Inc.*,
    666 F. Supp. 3d 1089 (C.D. Cal. 2023) ..................................................................................11

*Yei A. Sun v. Advanced China Healthcare, Inc.*,
    901 F.3d 1081 (9th Cir. 2018) ..................................................................................................3

**Statutes**

28 U.S.C. § 1391(b) .........................................................................................................................4

28 U.S.C. § 1404(a) .......................................................................................................................12

# INTRODUCTION

Plaintiff Martin Beltran individually, and on behalf of all others similarly situated (hereinafter "Plaintiff") respectfully opposes Defendant, Nationstar Mortgage LLC d/b/a Mr. Cooper's ("Mr. Cooper" or "Defendant") Motion to Transfer this case to the Northern District of Texas. D.E. 24. Venue in this case is proper because Mr. Cooper's forum selection clause is an unenforceable "sign-in wrap." This case belongs in this District.

# FACTUAL & PROCEDURAL BACKGROUND

Plaintiffs sought relief in this case on May 23, 2025, claiming that Mr. Cooper improperly collected and sold their private data to third parties. D.E. 1. Plaintiff Mark Beltran filed an amended complaint on September 8, 2025, and is the sole remaining Plaintiff. D.E. 26. This case is about a mortgage servicer turning into something much more nefarious: a dealer of data in violation of the law. Mr. Cooper did much more than simply service a loan. It collects and uses private customer data for its own business purposes and sells it to third parties. D.E. 1 at ¶¶ 34, 35; D.E. 26 at ¶¶ 32, 33. In detailed allegations, Plaintiffs have pled how Mr. Cooper's tracking software captures and transmits their data to third and fourth parties without their consent. D.E. 1 at ¶¶ 59–76; D.E. 26 at ¶¶ 57–74. In short, Mr. Cooper didn't just offer online mortgage services; it harvested and sold the private data of its customers.

Plaintiff Martin Beltran never even signed up for a mortgage with Mr. Cooper—his mortgage was bought out by Mr. Cooper from another mortgage servicer. D.E. 1 at ¶ 120; D.E. 26 at ¶ 123. Essentially, Mr. Cooper purchased an interest in real property in this District, presented Plaintiff with an alleged adhesion contract through an unenforceable "sign-in wrap" in this District, and then sold his data from this District to third and fourth parties to squeeze every last dime out of him. D.E. 26 at ¶¶ 2, 17–19, 24–33, 123–140. His mortgage payment was clearly not enough.

This case thus involves a mortgage issued in this District for property located in this District. After Plaintiff started using Mr. Cooper's website, he began seeing all kinds of ads because Mr. Cooper sold his data. D.E. 1 at ¶¶ 124, 141, 144; D.E. 26 at ¶¶ 128, 137, 140. On August 18, 2025, Mr. Cooper sought to dismiss and to transfer venue. D.E. 24, 25. Beltran filed an Amended Complaint on September 8, 2025. D.E. 26.

## ARGUMENT

Mr. Cooper's motion characterizes this case as a Texas-based dispute improperly brought in California and alleges that the parties have a valid contract. But what Mr. Cooper is trying to enforce here is not the terms of the *mortgage agreement* that Mr. Cooper bought from Beltran's original mortgage servicer – it is trying to enforce the sign-in wrap in an adhesion contract presented to Beltran when he tried to pay his mortgage online on Mr. Cooper's website. That adhesion contract is the source of the forum selection clause Mr. Cooper now seeks to invoke. There was no valid assent, and the sign-in wrap adhesion contract is unenforceable, and thus, this case stays here.

When Mr. Cooper acted intentionally to purchase Plaintiff Beltran's mortgage in this District, Mr. Cooper availed itself of this District's jurisdiction. The sign-in wrap that Mr. Cooper invokes to avoid this Court's jurisdiction is not enforceable. It was not conspicuously presented to Plaintiff such that he was on notice of its terms, and Mr. Cooper designed its website to distract Plaintiff from understanding the terms and conditions containing the forum selection clause invoked by Defendant. Plaintiff is entitled to proceed in his chosen forum in this District.

Think of it this way: if Mr. Cooper foreclosed on Plaintiff's property in California, it would do so in the courts where the real property was located (California). Its foreclosure rights would arise from the terms of the mortgage agreement. But Mr. Cooper is trying to enforce "bonus" terms

and conditions here that Mr. Beltran never agreed to. His data was stolen from him in California by virtue of him using a website in California offered to him by a servicer of his mortgage on real property located in California. Mr. Cooper's desire to litigate in its preferred forum after hiding its terms and conditions is of no moment. The case should stay here.

I.     **Standard of Review**

Defendant here invokes an alleged forum selection clause in a sign-in wrap agreement and also asserts that transfer is justified under a routine Section 1404(a) analysis. State law, here California, governs whether a contract exists. *Lee v. Plex, Inc.*, 773 F. Supp. 3d 755, 763 (N.D. Cal. 2025). This case concerns so-called "sign-in wrap" that contains a forum selection clause. *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024). In general, "courts should evaluate a forum-selection clause pointing to a nonfederal forum in the same way that they evaluate a forum-selection clause pointing to a federal forum." *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 61 (2013). The district court can consider a wide variety of factors under the Section 1404(a) analysis, including whether a valid forum selection clause is present. *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 499 (9th Cir. 2000). Choice of law and forum selection clauses are evaluated together. *Yei A. Sun v. Advanced China Healthcare, Inc.*, 901 F.3d 1081, 1088 n.4 (9th Cir. 2018).

II.     **Sign-In Wrap**

Venue is not complicated here. Plaintiff Beltran did not walk into his local Savings & Loan to call upon Jimmy Stewart to give him a mortgage to buy a house. His mortgage was *bought out* by Mr. Cooper. D.E. 1 at ¶ 120; D.E. 26 at ¶ 123. This is a national buyer and seller of financial services that offers mortgages in many states. D.E. 1 at ¶¶ 20, 25; D.E. 26 at ¶¶ 18, 23. So there is no question that when Plaintiff Beltran accessed his mortgage information online from the home

he owns in California, D.E. 1 at ¶ 17; D.E. 26 at ¶ 17, and when Mr. Cooper took his information without authorization, D.E. 1 at ¶¶ 124, 141, 144; D.E. 26 at ¶¶ 128, 137, 140, all key action in this movie occurred in California, the "judicial district in which a substantial part of the events or omissions giving rise to the claim occurred[.]" 28 U.S.C. § 1391(b)(2). Venue in this case is no more complex than that. All of the events in question took place in this District. That Mr. Cooper runs its operation from Texas does not change the analysis.

In attempting to justify why this case should move to Texas, Mr. Cooper points to the Terms of Use on its website, that included Texas forum selection and choice of law clauses, to which Mr. Cooper claims Plaintiff assented. D.E. 24 at 10; D.E. 24-1 (affidavit discussing terms of use), ¶ 15. In general, there are three different kinds of contracts companies present to consumers for "assent" over the Internet: "browsewrap," "clickwrap," and "sign-in wrap." *Lee v. Plex, Inc.*, 773 F. Supp. 3d 755, 763 (N.D. Cal. 2025).[1] Internet contracts present courts with difficult questions because the agreements are mostly contracts of adhesion, consumers do not generally have the ability to negotiate, and parties conducting business over the Internet have strong incentives to minimize the legal nature of what they are doing. Many Internet contracts do not carry the usual indicia of entering into an actual contract – signatures, presentment of the full agreement, and an opportunity to review.

Mr. Cooper used "sign-in wrap," which involves a link to a company's terms of use, *Lee*,

---

[1] Given the prevalence of contracts on the Internet, there are a great number of district court opinions on these subjects. It is easy to get lost in the weeds of the innumerable varieties of "wraps" and the different means of deception employed by web designers to distract a consumer. But what is important here is the traditional notion in contract law of true assent and a meeting of the minds. Did this Plaintiff really agree that Texas law would apply to this dispute? Did any consumer trying to just pay their mortgage online see the inconspicuous choice of law clause on a completely different page? Of course not.

773 F. Supp. 3d at 763, that customers must click to obtain an online account. D.E. 24-1 at ¶¶ 10–15. The website does not require the consumer to actually review the terms. D.E. 24-3 at 2 ("By clicking 'Save and Continue,' you agree to the Terms of Use for Mr. Cooper's website."). The general rule is that sign-in wrap will only be enforced if (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound, *and* (2) the consumer takes some action (like clicking a button or checking a box) that unambiguously manifests assent. *Lee*, 773 F. Supp. 3d at 763. Both elements are required.

The first inquiry (whether the website provides reasonably conspicuous notice) is context and fact specific. *Id.* at 764–65. Here, the contract in question offered by Mr. Cooper is not enforceable because the terms were not sufficiently conspicuous.

To assess whether a website provides reasonably conspicuous notice of sign-in wrap, the Court first considers the context of the transaction. *Id.* Here, while a mortgagor would likely expect a continuing relationship with a mortgagee, the context of *this* transaction is critical. Plaintiff Beltran's first mortgage was with a different company. D.E. 1 at ¶ 120; D.E. 26 at ¶ 123. In fact, he had to call Bank of America to determine why he was no longer able to pay his mortgage through their website. D.E. 26 at ¶ 124. Plaintiff then had to set up an account with Mr. Cooper to pay his mortgage. *Id.* Mr. Cooper offers two screenshots of the web pages Plaintiff Beltran would have seen during this process. D.E. 24-3 (two screenshots)[2]; D.E. 24-1 at ¶¶ 9–15 (declaration). As Mr. Cooper admits, the terms of use are on a separate web page from the account creation pages, D.E. 24-1 at ¶ 13:

---

[2] And even on the pertinent page, D.E. 24-3 at 2, the text of the relevant Terms of Use text are tiny and highly pixelated when one focuses in.

[Screenshots of Mr. Cooper "Let's Create Your Account" and "Create your Mr. Cooper account." web pages]

Here, both the context of the transaction and more importantly, the conspicuousness of the terms mean that this sign-in wrap is unenforceable.

First, the context of this transaction matters. "The nature of an agreement may anticipate 'some sort of continuing relationship. . . that would require some terms and conditions[.]'" *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1155 (9th Cir. 2025) (quoting *Sellers v. JustAnswer LLC*, 73 Cal.App.5th 444, 289 Cal. Rptr. 3d 1, 26 (2021)). When a mortgage is transferred to a new mortgagee, the consumer does not expect her rate to change or the terms of a long-term financial product to shift. That would defeat the purpose of the product. Imagine receiving a notice that one's 30-year mortgage had been purchased by a new servicer and that the interest rate was consequently changing. And in fact, the very first page Mr. Beltran would have seen required him

to enter his Last Name and Social Security Number to find his loan amongst others that presumably had been purchased by Mr. Cooper from Bank of America. D.E. 24-3 at 2.

In other words, Beltran would not have expected to be agreeing to a whole new array of terms and conditions with a new servicer—the new company simply bought a product issued to him by the old company. In this context, the very first button he clicked to access Mr. Cooper's loan services was "Find My Loan," not an agreement to any new terms and conditions. D.E. 24-3 at 2. No consumer expects—in this setup process for loan services on a mortgage unilaterally purchased by Mr. Cooper—that they are entering a *new* agreement on their already existing loan. Rather, they are simply looking through a register to find the new portal for their *already-existing* terms that the new bank has simply bought from the old bank. Contrary to this expectation, however, the terms and conditions are a wholly new agreement on an old loan. Mr. Cooper is surreptitiously trying to impose new—and adhesive—contractual obligations on people whose loans they purchase.

By the time the consumer reaches the next page, he has already entered his social security number and last name. D.E. 24-3 at 2. *See, e.g.*, *Seneca v. Homeaglow, Inc.*, No. 8:23-CV-02308-CJC-ADS, 2024 WL 750029, at *4 (C.D. Cal. Feb. 7, 2024) ("[A] customer *at this point* would have no reason to expect the post-hoc imposition of terms and conditions to the previous purchase of the cleaning voucher and automatically renewing membership.") (emphasis in original). Right off the bat, Mr. Cooper does not inform the consumer that his website engagement is nothing more than what is necessary to facilitate payment and other services on a pre-existing mortgage amongst the others that the new servicer purchased from the original servicer.

Certainly, in this context, there is no notice to the consumer that he is entering a *new contract* with Mr. Cooper. The first page, D.E. 24-3 at 2 (top screenshot), is critical context here

7

because the consumer is quite literally Finding *My* Loan. This is not clickwrap where a consumer is explicitly checking a box to purchase a new product from an online retailer or entering a new kind of transaction. The consumer is logging into a new portal to make the same payment he previously made on the same mortgage through a different website. The consumer already has established a "continuing relationship," *Chabolla*, 129 F.4th at 1155, and is not expecting to be bound by "bonus terms" from some random company that purchased the right to be paid on his mortgage.

      Courts next consider the visual aspects of the website. *Lee*, 773 F. Supp. 3d at 765. The overall design of the website and the placement of the notice are relevant. *Id.* And here, multiple design elements of the second page shown to consumers draw the eye away from Mr. Cooper's "Terms of Use." First, not only is the print tiny; the informational text is presented in a hardly visible light grey color. And it is easy to overlook—sandwiched between the user's entries for username and password and a big blue button to "**Save and Continue**" (emphasis original). Second, while "Terms of Use" appears in a different color than the surrounding text, D.E. 24-3 at 2, that blue font is precisely the same color as the header and footer of the webpage, in addition to the lock icon discussing password requirements. The eye is drawn by these identical colors, not to the "Terms of Use" text, but to the giant and much larger banner of identical color with "Mr. Cooper" in white text at the left. Moreover, the "terms of use" text—unlike other text on this page—is presented in lowercase. The page additionally contains a small greyed-out box at the very center of the screen with three separate lines of instructions for creating a secure password. This greyed-out box contains a blue "lock" icon that again draws the eye away, along with bolded and larger text stating "**Password Requirements**." D.E. 24-3 at 2. The "Terms of Use" text

8

PLAINTIFF'S OPPOSITION TO MR. COOPER'S MOTION TO TRANSFE VENUE
Case No. 3:25-CV-04412-JSC

appears at the very bottom.[3] In plain English, "Terms of Use" does not signal to an ordinary consumer that they are about to enter into yet another contract about an already-existing mortgage, let alone a venue selection clause in a location that has nothing to do with the property.[4]

"This is necessarily a visual and aesthetic analysis." *Godun v. JustAnswer LLC*, 135 F.4th 699, 709 (9th Cir. 2025). A user creating a password automatically through a browser like Chrome (which provides users with the ability to auto-generate secure passwords, as many other browsers now do) and pressing "Tab" and "Enter" could auto-generate a password without even having to click the "Save and Continue" button, which does *not* include a separate checkbox to assent to the Terms of Use. This makes the Terms of Use even easier to overlook—*or not even see*. The terms "Password Requirements" are also in the center of the page, in bold, and in a box with a different color—again, drawing the eye away from the tiny notice, mostly in light grey text, provided at bottom of the screen. Finally, the user must click "Save & Continue" to proceed. In other words, the website implies that the user is saving their password—the focus of the page—to continue on to look at the mortgage information that Mr. Cooper purchased from the original mortgage company. An ordinary consumer would not perceive that she is agreeing to the new terms by clicking "Save [Password] & Continue."

---

[3] Contrary to this actual presentation on its website, Mr. Cooper uses italicized, bolded, and underlined emphasis when referencing "Terms of Use" in its brief. D.E. 24 at 12; *see also* D.E. 24-1 at 3, ¶ 12. That term jumps right off the page in a sea of white margin and normal Times New Roman 12-font. On the actual second page Mr. Beltran would have seen, however, the words "Terms of Use" are buried amidst a cacophony of identical colors, big blue buttons, and larger font. All of this draws the eye away.

[4] The reader may recall, if one has reached this point in life, closing on a home for the first time, the piles of papers on the desk, the realtor taking a photo for the website, and the gravity of having purchased a house or condominium with a mortgage. That experience carries the gravity of signing a true contract. What Mr. Cooper characterizes as clear assent by agreeing to an online set of terms buried in the fine print is nothing like that.

Mr. Cooper deliberately designed its website this way, and the fact that Mr. Beltran clicked "Save and Continue" is not dispositive. *See Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 466 (S.D.N.Y. 2017) ("Regardless of the nomenclature, the classification of an online agreement does not conclude the inquiry, nor does the fact a consumer may have clicked a box."). The visual effect of these pages is to distract the consumer from the nature of the terms – it focuses attention instead on password requirements and finding the already-struck bargain (Plaintiff's mortgage) among the others that Mr. Cooper bought from Bank of America. Literally, the first button Beltran would have clicked is "Find My Loan."

This kind of deceptive design – where colors distract the user from what they are actually agreeing to – is a hallmark of user interface and design that is explicitly structured to pull the user away from understanding what is happening. *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022) ("And the textual notice is further deemphasized by the overall design of the webpage, in which other visual elements draw the user's attention away from the barely readable critical text."). "[T]he onus must be on website owners to put users on notice of the terms to which they wish to bind consumers." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1179 (9th Cir. 2014). Here, a member of the public would be drawn to the conspicuous components of the page – the password requirements. *Calhoun v. Google, LLC*, 113 F.4th 1141, 1151 (9th Cir. 2024) ("[A] determination of what 'reasonable' user would have understood must take into account the level of sophistication attributable to the general public, which uses Google's services.").

Mr. Cooper cannot overcome these numerous attempts to *hide* the agreement it is wishes to impose on consumers by merely putting the lowercase "terms of use" link in a blue color. The surrounding text, other surrounding features, and the structure of the page draw the eye away from that element of the design. The "Save & Continue" tab is in *dark* blue, drawing the eye down and

away from the lighter blue color with white text in the dark blue box. The "Terms of Use" language is in tiny font that is much smaller than the password requirements, the "Create Your Account" heading, and the bolded "Password Requirements" heading, which appears in the center of the page. *Cf. Serrano v. Open Rd. Delivery Holdings, Inc.*, 666 F. Supp. 3d 1089, 1096 (C.D. Cal. 2023) ("Here, the text stating that the user agrees to Defendant's terms of use is in a smaller font than both the 'Sign Up' button and the line for account-holders to sign in.") (analyzing sign-in wrap). It is not sufficient that the "Terms of Use" text was near the "Save & Continue" tab. "[P]roximity alone is not enough to give rise to constructive notice." *Kuhk v. Playstudios Inc.*, No. 2:24-CV-00460-TL, 2024 WL 4529263, at *7 (W.D. Wash. Oct. 18, 2024) (relatively inconspicuous notice compared to the bright colors on rest of page).

The cases cited by Mr. Cooper did not analyze this issue in detail or focus on hyperlinked terms and conditions without examining the other content on the page. In *Lee v. Ticketmaster L.L.C.*, 817 F. App'x 393, 394 (9th Cir. 2020), a short decision without much analysis on how the webpage looked, the consumer had continually clicked "Place Order" for tickets and had assented "roughly twenty" times to the terms. In *Capps*, the website's design made the terms easy to see. *Capps v. JPMorgan Chase Bank, N.A.*, No. 2:22-CV-00806-DAD-JDP, 2023 WL 3030990, at *4 (E.D. Cal. Apr. 21, 2023). In *Bender*, the page in question was "uncluttered and high contrast," in direct contrast to these pages. *Bender v. Twilio Inc.*, No. 24-CV-04914-AMO, 2025 WL 2308484, at *4 (N.D. Cal. Aug. 11, 2025). And in *Phillips*, the website was primarily for mobile use. *Phillips v. Neutron Holdings, Inc.*, No. 3:18-CV-3382-S, 2019 WL 4861435, at *4 (N.D. Tex. Oct. 2, 2019).

What all of this means, ultimately, is that Plaintiff never consented to the terms that include the forum selection clause asserted here by Mr. Cooper. Mortgages are products designed to benefit consumers. Adding "bonus terms and conditions" every time a consumer's mortgage is

purchased—especially through sign-in wrap containing distracting colors that focuses the consumer on simply creating a strong password to pay their mortgage online—is deceptive and illegitimate. And what even would have been the consideration for such an agreement? Questions like these trouble courts because frequently, these kinds of agreements are not real contracts. The essence of this case is that Defendant stole Plaintiff's data and sold it. He is entitled to his chosen forum.

### III.    1404(a) Analysis

Mr. Cooper also lodges its request for transfer under the traditional analysis of 28 U.S.C. § 1404(a). D.E. 24 at 9. The Court can consider a large number of traditional factors under this analysis, including:

> For example, the court may consider: (1) the location where the relevant agreements were negotiated and executed, (2) the state that is most familiar with the governing law, (3) the plaintiff's choice of forum, (4) the respective parties' contacts with the forum, (5) the contacts relating to the plaintiff's cause of action in the chosen forum, (6) the differences in the costs of litigation in the two forums, (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses, and (8) the ease of access to sources of proof. Additionally, the presence of a forum selection clause is a "significant factor" in the court's § 1404(a) analysis. We also conclude that the relevant public policy of the forum state, if any, is at least as significant a factor in the § 1404(a) balancing.

*Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498–99 (9th Cir. 2000). The movant, here Mr. Cooper, bears the burden of showing that another forum is more appropriate. *Id.* at 499 n.22. That burden is heavy. *E. & J. Gallo Winery v. F. & P. S.p.A.*, 899 F. Supp. 465, 466 (E.D. Cal. 1994) ("F & P bears a heavy burden of showing a clear balance of inconveniences to it. Affidavits or declarations are required to identify key witnesses and a generalized statement of their anticipated testimony.") (internal citations omitted).

The analysis here is simple. Plaintiff chose to file this case in California, where Mr. Cooper

bought out his mortgage. Many of the third parties that allegedly received the data taken by Mr. Cooper are located in California, like Adobe and Facebook. Mr. Cooper offers nothing more than a bare-bones declaration to assert that a majority of its employees are located in Texas, D.E. 24-1 at ¶ 6, but offers little in the way of explaining what their testimony might be. The forum selection clause presented by Mr. Cooper is unenforceable sign-in wrap, as explained above. Discovery can be conducted remotely where possible. Most importantly, Mr. Cooper chose to purchase mortgages in California and then sold the data of California consumers like Plaintiff. It cannot now contend that a forum in which it chose to purchase interests in real property is not an appropriate venue to litigate claims stemming from its sale of mortgagor's data. The Defendant in this case has raised literally nothing that links the Plaintiff to Texas other than Plaintiff's use of a website in California to pay his mortgage on a property located in California.

Now that Plaintiff Beltran is the only named Plaintiff, D.E. 26, there is no personal jurisdiction problem over the other original Plaintiffs. Moreover, this is not even a mortgage that Mr. Cooper originated, but one that Mr. Cooper bought to service and benefit from. Mr. Cooper's invocation of a vast number of irrelevant cases obscure the simple facts of this case, that Mr. Cooper purchased mortgages in California (among them Plaintiff's), and then sold Plaintiff's data without his consent. Mr. Cooper came to this District armed against ordinary consumers (who did not elect to deal with Mr. Cooper at the outset of buying their homes) with deceptive terms and conditions. Its lawyers know how to litigate here, as evidence by their motion. This case should stay in California.

| | |
|---|---|
| Dated: September 26, 2025 | Respectfully submitted,<br><br>/s/ Natalie Lyons<br>Natalie Lyons, No. 293026<br>Vess A. Miller, No. 278020<br>Lynn A. Toops*<br>Lisa M. La Fornara*<br>COHENMALAD, LLP<br>One Indiana Square, Suite 1400<br>Indianapolis, Indiana 46204<br>(317) 636-6481<br>nlyons@cohenmalad.com<br>vmiller@cohenmalad.com<br>ltoops@cohenmalad.com<br>llafornara@cohenmalad.com<br><br>J. Gerard Stranch, IV*<br>Emily E. Schiller*<br>STRANCH, JENNINGS & GARVEY, PLLC<br>223 Rosa L. Parks Avenue, Suite 200<br>Nashville, Tennessee 37203<br>(615) 254-8801<br>(615) 255-5419 (facsimile)<br>gstranch@stranchlaw.com<br>eschiller@stranchlaw.com<br><br>Samuel J. Strauss*<br>Raina C. Borrelli*<br>STRAUSS BORRELLI, PLLC<br>980 N. Michigan Avenue, Suite 1610<br>Chicago, Illinois 60611<br>(872) 263-1100<br>(872) 263-1109 (facsimile)<br>sam@straussborrelli.com<br>raina@straussborrelli.com<br><br>*To seek admission *pro hac vice*<br><br>**Counsel for Plaintiff and the Proposed Classes** |

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the clerk of the court for the United States District Court for the Northern District of California by using the CM/ECF system on September 26, 2025. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system. I certify under penalty of perjury that the foregoing is true and correct.

Dated: September 26, 2025               */s/ Natalie A. Lyons*
                                        Natalie A. Lyons