ALLISON J. SCHOENTHAL (*pro hac vice*)
*ASchoenthal@goodwinlaw.com*
**GOODWIN PROCTER LLP**
The New York Times Building
620 Eighth Avenue
New York, New York, 10018
Tel.: +1 212 459 7183
Fax: +1 212 937 3850

W. KYLE TAYMAN (*pro hac vice*)
*KTayman@goodwinlaw.com*
**GOODWIN PROCTER LLP**
1900 N Street, N.W.
Washington, DC, 20036-1612
Tel.: +1 202 346 4000
Fax: +1 202 346 4444

REBECCA L. TARNEJA (SBN 293461)
*rtarneja@goodwinlaw.com*
**GOODWIN PROCTER LLP**
601 South Figueroa Street, Suite 4100
Los Angeles, California, 90017
Tel.: +1 213 426 2500
Fax: +1 213 623 1673

Attorneys for Defendant
NATIONSTAR MORTGAGE LLC d/b/a MR. COOPER

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| MARTIN BELTRAN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NATIONSTAR MORTGAGE LLC d/b/a MR. COOPER,<br><br>Defendant. | Case No. 3:25-cv-04412-JSC<br><br>**DEFENDANT MR. COOPER'S REPLY MEMORANDUM OF POINTS AND AUTHORITY IN SUPPORT OF MOTION TO TRANSFER VENUE**<br><br>Hearing: November 20, 2025<br>Time: 10:00 a.m.<br>Location: 8, 19th Floor<br>Judge: Honorable Jacqueline Scott Corley |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 2

I.    The Parties' Forum Selection Clause Requires Transfer. ........................................ 2

    A.    Plaintiff Does Not Dispute Agreeing to Mr. Cooper's Terms. ................... 2

    B.    Plaintiff's Loan Transfer Does Not Alter His Express Assent to the Terms. .......... 3

    C.    The Terms Were Clear and Conspicuous.................................................... 7

II.    The Section 1404(a) Analysis Also Favors Transfer. ........................................ 13

CONCLUSION ............................................................................................................... 15

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

*Amculture Trading, Inc. v. Renaissance Imports, Inc.*,
    2011 WL 13217697 (C.D. Cal. Jan. 3, 2011) .......................................................... 6

*Applebaum v. Lyft, Inc.*,
    263 F. Supp. 3d 454 (S.D.N.Y. 2017)................................................................... 11

*Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*,
    571 U.S. 49 (2013)................................................................................................ 3, 13

*Bender v. Twilio Inc.*,
    2025 WL 2308484 (N.D. Cal. Aug. 11, 2025).................................................... 9, 12

*Berman v. Freedom Financial Network, LLC*,
    30 F.4th 849 (9th Cir. 2022) ...................................................................................10

*Capps v. JPMorgan Chase Bank, N.A.*,
    2023 WL 3030990 (E.D. Cal. Apr. 21, 2023)..................................................... 9, 12

*Chabolla v. ClassPass Inc.*,
    129 F.4th 1147 (9th Cir. 2025) ................................................................................ 6

*FTC v. Wyndham Worldwide Corp.*,
    2013 WL 1222491 (D. Ariz. Mar. 25, 2013) ........................................................ 15

*Fteja v. Facebook, Inc.*,
    841 F. Supp. 2d 829 (S.D.N.Y. 2012)................................................................... 15

*Ghazizadeh v. Coursera, Inc.*,
    737 F. Supp. 3d 911 (N.D. Cal. 2024) .................................................................... 7

*Hart v. Charter Commc'ns, Inc.*,
    2017 WL 6942425 (C.D. Cal. Nov. 8, 2017),
    *aff'd*, 814 F. App'x 211 (9th Cir. 2020)................................................................... 8

*Johnson v. Walmart Inc.*,
    57 F.4th 677 (9th Cir. 2023) .................................................................................... 5

*Keebaugh v. Warner Bros. Ent. Inc.*,
    100 F.4th 1005 (9th Cir. 2024) ................................................................................ 7

*Kuhk v. Playstudios Inc.*,
    2024 WL 4529263 (W.D. Wash. Oct. 18, 2024) .................................................. 12

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Lee v. DoNotPay, Inc.*,
    683 F. Supp. 3d 1062 (C.D. Cal. 2023) ................................................................ 12

*Lee v. Plex, Inc.*,
    773 F. Supp. 3d 755 (N.D. Cal. 2025) .................................................................. 11

*Lee v. Ticketmaster L.L.C.*,
    817 F. App'x 393 (9th Cir. 2020) ................................................................... 9, 12

*Lewis v. Sw. Airlines Co.*,
    2016 WL 3091998 (N.D. Cal. June 2, 2016) ....................................................... 13

*Lou v. Belzberg*,
    834 F.2d 730 (9th Cir. 1987) ............................................................................. 13

*M/S Bremen v. Zapata Off-Shore Co.*,
    407 U.S. 1 (1972) .............................................................................................. 3

*Madani v. Shell Oil Co.*,
    2008 WL 268986 (N.D. Cal. Jan. 30, 2008) ....................................................... 13

*Motorola Mobility, Inc. v. Microsoft Corp.*,
    2011 WL 5834923 (N.D. Cal. Nov. 21, 2011) ..................................................... 13

*Oberstein v. Live Nation Ent., Inc.*,
    2021 WL 4772885 (C.D. Cal. Sept. 20, 2021),
    *aff'd*, 60 F.4th 505 (9th Cir. 2023) ................................................................... 12

*Patrick v. Running Warehouse, LLC*,
    2022 WL 10584136 (C.D. Cal. Oct. 18, 2022),
    *aff'd*, 93 F.4th 468 (9th Cir. 2024) ................................................................... 12

*Phillips v. Neutron Holdings, Inc.*,
    2019 WL 4861435 (N.D. Tex. Oct. 2, 2019) ................................................. 10, 12

*Randles v. Nationstar Mortg., LLC*,
    2024 WL 1855720 (E.D. Cal. Apr. 26, 2024) ..................................................... 14

*Robert Bosch, LLC v. Snap-On Inc.*,
    2012 WL 12931147 (C.D. Cal. Apr. 4, 2012) ..................................................... 14

*Sarhadi v. Pear Health Labs, Inc.*,
    2025 WL 1350033 (N.D. Cal. Apr. 18, 2025) ....................................................... 7

*Seneca v. Homeaglow, Inc.*,
    2024 WL 750029 (C.D. Cal. Feb. 7, 2024),
    *aff'd*, 2025 WL 852896 (9th Cir. 2025) ............................................................. 11

*Serrano v. Open Rd. Delivery Holdings, Inc.*,
    666 F. Supp. 3d 1089 (C.D. Cal. 2023) .................................................................. 12

*Whalen v. NBA Props., Inc.*,
    2025 WL 1948591 (N.D. Cal. July 16, 2025) ........................................................ 11

*Zeta-Jones v. Spice House*,
    372 F. Supp. 2d 568 (C.D. Cal. 2005) ................................................................... 15

**Statutes**

28 U.S.C. § 1404(a) ...................................................................................... 1, 2, 13, 15

**Other Authorities**

California-Single Family-Fannie Mae/Freddie Mac Uniform Instrument, Form
    3005 (July 2021), *available at* https://sf.freddiemac.com/docs/doc/uniform-
    instruments/form-3005-california_deed-of-trust_07.2021.docx ............................... 4

*What happens if the company that I send my mortgage payments to changes?*,
    Consumer Financial Protection Bureau (last reviewed Apr. 3, 2024), *available
    at* https://www.consumerfinance.gov/ask-cfpb/what-happens-if-the-company-
    that-i-send-my-mortgage-payments-to-changes-en-215 ........................................... 4

## INTRODUCTION

Plaintiff twists himself in knots trying to avoid the parties' contractually agreed-upon forum selection clause. As Mr. Cooper explained at length in its Opening Memorandum, the Northern District of Texas is the proper venue for this case. It is required by both (1) the parties' binding forum selection clause, and (2) a traditional 28 U.S.C. § 1404(a) analysis. Plaintiff's attempts to avoid transfer on both grounds are unpersuasive.

Plaintiff does not dispute that he agreed to and accepted Mr. Cooper's Terms, and the incorporated forum selection clause. He also does not contest that the clause is presumed valid and should be enforced under binding Supreme Court precedent. Nor does he contest that, when voluntarily creating a Mr. Cooper online account, he inputted his account-creation information, and immediately below those fields was the prominently displayed text: "By clicking 'Save and Continue' you agree to the ***Terms of Use*** for Mr. Cooper's website," with "***Terms of Use***" bolded, in bright blue, and hyperlinked to Mr. Cooper's Terms. *See* ECF 25-5. Proximately under that text was the button "Save & Continue," which Plaintiff does not deny clicking. Instead, Plaintiff suggests that Mr. Cooper's Terms are "unenforceable 'sign-in wrap'" based on two false premises. *First*, Plaintiff's major premise—expressed through his counsel only and not by sworn declaration—is that he would not have "expected to be agreeing to a whole new array of terms and conditions with a new servicer" when his loan was transferred to Mr. Cooper. ECF 29 at 1–13. But Plaintiff fundamentally confuses *loan terms* and *website terms*. There is no allegation that Mr. Cooper changed the terms of Plaintiff's loan, nor do his loan terms concern this case, which is about Mr. Cooper's alleged use of advertising trackers on its website. Plaintiff could pay his mortgage through several different means; that he chose to do so by creating an online account was not forced upon him. Thus, when he voluntarily clicked and agreed to the "***Terms of Use*** for Mr. Cooper's website," he accepted those terms and the forum selection clause. *Second*, Plaintiff's minor premise is that the "***Terms of Use***" hyperlink was not adequately visible when Plaintiff clicked to agree to the Terms. While Plaintiff tries to make this argument based on his shrinkage of two full webpages down to a half-page in his brief, his tricks of illusion cannot save him. The Ninth Circuit and this

Goodwin Procter LLP
Attorneys at Law

District have repeatedly enforced webpages with similar (and even less conspicuous) disclosures of terms and assent. Plaintiff's attempt to distinguish those cases falls flat.

As for the Section 1404(a) analysis, Plaintiff provides no basis for his conclusion that the case should stay in California. Although Plaintiff asserts (at 12) that he "chose to file this case in California," he does not dispute that a plaintiff's choice of forum in a class action lawsuit is given "minimal deference." ECF 24 at 10. Likewise, Plaintiff does not even address the vast majority of the factors that favor transfer—*e.g.*, the interests of justice, location of relevant events, access to proof, cost of litigation, forum's contacts with the claims, relative court congestion, and familiarity with the governing law. Rather, he relies upon only unsupported rhetoric. And while the Amended Complaint eliminated two named plaintiffs in a manufactured effort to avoid the conclusion that this case should be transferred, the Section 1404(a) factors still overwhelmingly support transfer. At bottom, this putative class action lawsuit concerns "allegations about Mr. Cooper's website, policies and procedures, and actions ..., all of which occurred in Texas, the forum in which Mr. Cooper is located has a vastly greater connection to the claims." *Id.* at 8–9.

Plaintiff's Opposition confirms that this case belongs in Texas and that the Court should grant the transfer to the Northern District of Texas.

## **ARGUMENT**

## I.    **The Parties' Forum Selection Clause Requires Transfer.**

### A.    **Plaintiff Does Not Dispute Agreeing to Mr. Cooper's Terms.**

Plaintiff does not dispute that he created an online account with Mr. Cooper, in which he clicked "Save and Continue" above which states: "By clicking 'Save and Continue,' you agree to the ***Terms of Use*** for Mr. Cooper's website," where the words "***Terms of Use***" are in bold and a bright blue font, are against a white background, and are clearly hyperlinked to the Terms, and the surrounding text is grey to draw the user's attention to the "***Terms of Use***." ECF 24 at 1–13. He also does not dispute that the forum provision was conspicuous within the Terms, and squarely covers this case. *See id.* He tellingly submits no testimony or facts at all to contest the record presentation by Mr. Cooper. As to the law, he does not dispute that forum selection clauses are presumed valid and are enforced, and that this case is not an "exceptional case[]" that would permit

the Court ignore this contractual term. ECF 24 at 1, 3–4 (citing *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 56–57 (2013); *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10, 15 (1972)).

Rather, Plaintiff maintains only that (1) "[w]hen a mortgage is transferred to a new mortgagee, the consumer does not expect her rate to change or the terms of a long-term financial product to shift," and (2) a consumer would not understand that he is agreeing the Terms of Use by clicking "Save and Continue." ECF 29 at 1–12. The Court should reject these erroneous claims.[1]

**B.      Plaintiff's Loan Transfer Does Not Alter His Express Assent to the Terms.**

Plaintiff's effort to avoid his agreement to the forum selection provision because his mortgage loan was previously serviced by a prior lender is too clever by half. Plaintiff's confusion on this point is all the more mystifying in light of his central allegations in the Amended Complaint that he agreed to Mr. Cooper's online Privacy Policies and Terms— which he specifically alleges form "Privacy Contracts" and representations that underpin all of his claims. *See, e.g.*, ECF 26 ¶¶ 28, 78, 79, nn. 7, 29. Plaintiff cannot on the one hand allege that the online Privacy Policy was an agreement with him that created obligations independent of his mortgage, while on the other assert that the online Terms did not and that it would be confusing for any consumer to understand that an online account agreement is separate and apart from a previously entered mortgage contract. Plaintiff cannot pick and choose which contractual provisions he wishes to understand, wishes to understand, and when.

Further, Plaintiff misapprehends his own case: the Amended Complaint[2] alleges that Mr. Cooper's website improperly used advertising trackers, *not* that Mr. Cooper changed his loan terms. *E.g.*, ECF 26 ¶ 3 ("Mr. Cooper … knowingly and secretly configur[ed] and implement[ed] code-based tracking devices … into its Website."). Thus, his repeated arguments that a hypothetical

---

[1] Mr. Cooper vigorously rejects Plaintiff's mischaracterizations of the facts, including, for example, that Mr. Cooper is a "nefarious … dealer of data in violation of the law." ECF 29 at 1. Those allegations are irrelevant to the Motion to Transfer and are separately disposed of through Mr. Cooper's pending Motion to Dismiss the Amended Complaint. ECF 30.

[2] Plaintiff's Amended Complaint, ECF 26, does not alter the Motion to Transfer. Plaintiff Martin Beltran continues to allege that he "set up an account with Mr. Cooper," ECF 26 ¶¶ 124, 128; "regularly uses Mr. Cooper's Website to review his account, manage his mortgage, and make payments," *id.* ¶ 126; and relied on the Terms' provisions, *id.* ¶¶ 28, 79 nn. 7, 29 (citing the Terms).

consumer would not anticipate his loan terms to change make no sense. *See* ECF 29 at 6 ("When a mortgage is transferred to a new mortgagee, the consumer does not expect her rate to change or the terms of a long-term financial product to shift."); *see also, e.g.*, *id.* at 2–3 ("Mr. Cooper is trying to enforce 'bonus' terms" additional to the "terms of the mortgage agreement"), 6 ("Imagine receiving a notice that one's … interest rate was [] changing."); 7 ("Beltran would not have expected to be agreeing to a whole new array of terms and conditions with a new servicer"), 8 (a consumer "is not expecting to be bound by 'bonus terms' from some random company that purchased the right to be paid on his mortgage"). It further makes no sense because the standard federal mortgage agreement grants the original lender the right to transfer the servicing rights, without alteration of the terms, which is a public fact that is common, and widely understood. *See, e.g.*, California-Single Family-Fannie Mae/Freddie Mac Uniform Instrument, Form 3005, ¶ 22 (July 2021) ("The Loan Servicer may change one or more times during the term of the Note. The Loan Servicer may or may not be the holder of the Note."), *available at* https://sf.freddiemac.com/docs/doc/uniform-instruments/form-3005-california_deed-of-trust_07.2021.docx; *What happens if the company that I send my mortgage payments to changes?*, Consumer Financial Protection Bureau (Apr. 3, 2024), *available at* https://www.consumerfinance.gov/ask-cfpb/what-happens-if-the-company-that-i-send-my-mortgage-payments-to-changes-en-215.

By contrast, Plaintiff does not, and cannot, challenge that a consumer *would* understand that, when registering an online account for a new website—and clicking "'Save and Continue,' [to] agree to the **Terms of Use** for Mr. Cooper's website"—he is agreeing to that website's Terms. ECF 29 at 5. Indeed, the Ninth Circuit and courts in this District routinely enforce nearly identical agreements to online terms of use when registering an account. *See* ECF 24 at 4–5 (citing cases). Plaintiff does not cite any authority that creating an online account on a new website after a mortgage transfer makes the new website's Terms any less enforceable. It does not: consumers readily understand that they are using a new website when they affirmatively register a new account with the new website and agree to its terms, separate and apart from a different company's website that previously serviced the mortgage. Plaintiff himself admits he had no confusion that he was

creating an online account through a new loan servicer on a new website. *E.g.*, ECF 26 ¶ 123 ("Mr. Coooper bought out the mortgage and so Plaintiff Beltran opened an online account with Mr. Cooper."); *id.* ¶ 124 (Bank of America "directed him to Mr. Cooper," where he "set up an account with Mr. Cooper"); *id.* ¶ 128 ("Beltran opened an online account with Mr. Cooper"). And he does not dispute that, to do so, he clicked to agree to the hyperlinked "***Terms of Use*** for Mr. Cooper's website." Likewise, Plaintiff's claim that the Terms are an "adhesion contract" because "[i]nternet contracts … are mostly contracts of adhesion [since] consumers do not generally have the ability to negotiate" ECF 29 at 2, 4, runs contrary to established law.[3] Indeed, courts in the Ninth Circuit routinely enforce online Terms, and do not find them inherently adhesive. *See* ECF 24 at 4–5 (citing cases enforcing online Terms). Plaintiff simply ignores this wall of authority. The Terms, then, should be enforced.

Plaintiff's arguments about the "context" of the Terms, ECF 29 at 5–8, rest on his attempt to conflate *website* terms with *loan* terms, and they are wrong. For example, Plaintiff suggests, without support, that the website Terms supply "bonus" terms to the underlying "mortgage agreement." ECF 29 at 2, 7–8, 11. Again, this argument rests on the fiction that consumers cannot differentiate between a mortgage originator and later servicer, as most consumers accept in a standard mortgage agreement. Regardless, website terms govern the use of a website irrespective of an underlying contract, and they do so here. Mr. Cooper's website Terms—including the forum provision—govern the use of the website, not substantive terms of the loan. *See* ECF 24-2 at 7 ("The user's access to and use of the Mr. Cooper websites and mobile apps, and the terms of this disclaimer are governed by all applicable Federal laws and the laws of the state of Texas; and the user agrees that venue shall be located in Dallas County, Texas."); *see, e.g.*, *Johnson v. Walmart Inc.*, 57 F.4th 677, 682 (9th Cir. 2023) (online terms of use governed "access to and use of all Walmart Sites" whereas Walmart Auto Center's tire servicing agreement covered the disputed in-store engagement). Plaintiff's ancillary references to loan-related actions—*e.g.*, foreclosure actions

---

[3] Plaintiff was not required to create an account with Mr. Cooper to receive information about his mortgage or make his payments; he had several alternative payment options but voluntarily chose to create an online account and agree to the online Terms. *See Payment Options*, MR. COOPER, https://www.mrcooper.com/help-center/payments/payment-options.

and the papers required to purchase a home, ECF 29 at 2, 4—are red herrings as those activities concern the mortgage itself and are not at issue in this lawsuit nor within the scope of Mr. Cooper's Terms.[4]

It is unsurprising, then, that Plaintiff can cite nothing to support that website terms supply "bonus terms" to mortgage agreements, or are "adhesive" because his loan was transferred. ECF 29 at 3–8. Again, they are not. Plaintiff admits that he affirmatively took steps to open a new account on a new website (which was not a condition to continue to access or pay his mortgage), and clicked "Save and Continue" to agree to the new website Terms. Rhetoric aside, there is nothing "surreptitious" or "imposi[ing]" about that. *Id.* at 7; *see Amculture Trading, Inc. v. Renaissance Imports, Inc.*, 2011 WL 13217697, at *1 (C.D. Cal. Jan. 3, 2011) (rejecting plaintiff's arguments in opposition to defendant's motion to transfer as "merely conclusory" and lacking "any discussion of [supporting] facts").

The cases Plaintiff cites to suggest that the nature of his transaction with Mr. Cooper did not create an expectation of an ongoing relationship shows just how wide of the mark he is here. In *Chabolla v. ClassPass Inc.*, 129 F.4th 1147 (9th Cir. 2025), there was ambiguity as to whether the context of the transaction indicated "'some sort of continuing relationship ... that would require some terms and conditions,'" due to indications that "[t]he transaction … [is] a one-time purchase" and the fact that "[t]he user does not create a username or password and is not asked to make an account." *Id.* at 1155 (citation omitted). Just the opposite here: Plaintiff admits that he entered a username and password to create an online account. ECF 26 ¶¶ 123–24; ECF 29 at 8–12. And there is no doubt that he anticipated an ongoing relationship when, to "pay his [monthly] mortgage, [he] … set up an account with Mr. Cooper." ECF 26 ¶¶ 123–24; *see also id.* ¶ 126 ("Beltran regularly uses Mr. Cooper's website"); *id.* ("He has been using the website anywhere between a few times a month to a few times a week since 2021-2022"). Courts in this District find that users had

---

[4] Plaintiff's reference to the "Find My Loan" field on the account-creation page, ECF 29 at 7–8, 10, is equally specious. A user clicks the "Find My Loan" button as part of the process to create a new online account, and the button is located on a page that says in large, bold font, "Let's Create Your Account," followed by: "Setting up an online account with Mr. Cooper is quick and easy. Just enter a few details below to get started." ECF 24-3 at 2. No "reasonable" user would be confused that they are creating an online account.

conspicuous notice of online terms in this context—*i.e.*, when they created online accounts and then engaged in an ongoing relationship. *See, e.g.*, *Sarhadi v. Pear Health Labs, Inc.*, 2025 WL 1350033, at *5–6 (N.D. Cal. Apr. 18, 2025) (the context of the transaction supported conspicuous notice where "Plaintiff was required to create an Aaptiv account and then engaged in an ongoing relationship with Aaptiv") (citing *Keebaugh v. Warner Bros. Ent. Inc*., 100 F.4th 1005, 1009–13 (9th Cir. 2024)); *see also Ghazizadeh v. Coursera, Inc*., 737 F. Supp. 3d 911, 926 (N.D. Cal. 2024) (users of continuing services "would … expect (or should expect) their access to the platform would be continual and governed by some terms of use").

Under a straightforward application of law, Plaintiff assented to the Mr. Cooper's Terms by clicking to agree to the Terms in creating an online account to pay his monthly mortgage online.

**C.    The Terms Were Clear and Conspicuous.**

As Mr. Cooper explained, the Ninth Circuit has found the exact account-creation process and visual aspects of its account-creation page enforceable. ECF 24 at 4–5. In response, Plaintiff claims that the visual aspect of the website did not provide him with sufficient notice of the Terms because: (1) the "***Terms of Use***" language is "tiny," "a hardly visible light grey color," and "sandwiched" after the boxes to enter a username and password and before the "Save and Continue" button a user must click to agree to the Terms; and (2) the "Terms of Use" text is the same color as the "header and footer of the webpage" and the "lock icon." ECF 29 at 7–9. Plaintiff grossly mischaracterizes Mr. Cooper's website.

As displayed below (without Plaintiff's artificial shrinkage of the page's appearance), the "***Terms of Use***" language:

- is bright blue, bolded, italicized, and in the same size font as other text;
- is not "sandwiched" between anything, but is located immediately above the "Save & Continue" box a user must click to agree to the Terms; and
- while the bright blue color of "***Terms of Use***" matches that of the "header and footer of the webpage" and the small "lock icon," the entire account-creation box is uncluttered, against a white background, and surrounded by light grey text, all of which

conspicuously draws a users' attention to the bolded, bright blue "***Terms of Use***."
ECF 25-5 at 2.



Importantly, Plaintiff himself alleges that the Terms contain representations that he relied upon, ECF 26 ¶¶ 28, 78, 79, nn. 7, 29, which admits away that he saw and agreed to the Terms. He cannot now disavow those very same Terms. *See, e.g., Hart v. Charter Commc'ns, Inc.*, 2017 WL 6942425, at *4 (C.D. Cal. Nov. 8, 2017), *aff'd*, 814 F. App'x 211 (9th Cir. 2020) ("Consequently, Plaintiffs' own declarations defeat their challenge that the notice of the 2014 RSSA was not '[r]easonably conspicuous.'") (citation omitted).[5]

Notwithstanding his alleged agreement to the Terms, Plaintiff relies largely on unsupported rhetoric that the Terms are "deceptive," "*hid[den]*," "illegitimate," "not real contracts," etc., ECF 29 at 8–12, as opposed to actual facts. But the account-creation page, *supra*, shows nothing deceptive at all—only the very same visual elements the Ninth Circuit finds clear and enforceable.

---

[5] Plaintiff's claim that agreeing to website "***Terms of Use***" when creating an online account "does not signal to an ordinary consumer that they are about to enter into [] another contract," with reference to home purchase agreements, ECF 29 at 9 & n.4, is again misplaced. A reasonable consumer understands that opening online accounts to use a website is not purchasing a home.

1    *See* ECF 24 at 4–5.

2         Plaintiff attempts to brush away this Ninth Circuit authority to no effect. ECF 29 at 11. In

3    *Lee v. Ticketmaster L.L.C.*, 817 F. App'x 393 (9th Cir. 2020), the Ninth Circuit described the visual

4    features present here, and found that plaintiff "validly assented to [the] Terms of Use":

5         *each time* he clicked the "Sign In" button when signing into his [] account, where
          three lines below the button, the website displayed the phrase, "By continuing past
6         this page, you agree to our Terms of Use," as well as *each time* he clicked the 'Place
          Order' button when placing an order for tickets, where directly above the button, the
7         website displayed the phrase, "By clicking 'Place Order,' you agree to our Terms of
          Use," where in both contexts, "Terms of Use" was displayed in blue font and
8         contained a hyperlink to [the] Terms.

9    *Id.* at 394–95 (emphasis added). The multiple assents only support that each one was valid. *See id.*

10   Likewise, in *Capps v. JPMorgan Chase Bank, N.A.*, 2023 WL 3030990 (E.D. Cal. Apr. 21, 2023),

11   the plaintiff agreed to terms where:

12        [P]laintiff received the following disclosure in bolded text immediately above the
          "Create Your Account" button when creating their account: "By clicking 'Create
13        Your Account': I accept and agree to your Terms of Use Agreement ...." … The
          phrase 'Terms of Use Agreement' in the disclosure was a blue hyperlink that, if
14        clicked, would have presented plaintiffs with the full text of the Terms of Use
          Agreement ….
15

16   *Id.* at \*4. Contrary to Plaintiff's claim (at 11), the website design the court enforced there was far

17   less "easy to see" than the Terms disclosure here, due to significant text surrounding the terms. *See*

18   Declaration of W. Kyle Tayman ("Tayman Decl."), Ex. A. And a visual review of the account-

19   creation page in *Bender v. Twilio Inc.*, 2025 WL 2308484, at \*2 (N.D. Cal. Aug. 11, 2025), makes

20   clear that the disclosure was not in "high[er] contrast" to Mr. Cooper's, as the page largely parallels

21   Mr. Cooper's account-registration page except the hyperlinked "Terms" were neither in bold nor a

22   different color. ECF 29 at 11.[6] *See* Tayman Decl., Ex. B. Finally, Plaintiff's distinction (at 11) of

23   *Phillips v. Neutron Holdings, Inc.*, 2019 WL 4861435 (N.D. Tex. Oct. 2, 2019) as "primarily for

24   mobile use" is grasping at straws. Plaintiff himself relies on cases involving mobile terms of use.

25   *See infra* at 11.

26   ───────────────────────

27   [6] Plaintiff's statement that a user could "auto-generate a password" through their own web browser
     like Chrome is pure distraction. Mr. Cooper cannot control the web browser through which a user
     accesses its site, nor whether a user employs available features of the browser, like password
28   creation. ECF 29 at 9.

All of these cases readily dispose of Plaintiff's complaint that "the terms 'Password Requirements' … draw[] the eye away" from the disclosure language further down on the screen. ECF 29 at 9 (misleadingly inserting "[Password]" into "Save & Continue"). As Plaintiff concedes (at 9), the "user must click 'Save & Continue'" to proceed, which necessarily requires the user to read down the webpage and read the conspicuous disclosure of the Terms hyperlink before reaching the "Save & Continue" button. ECF 24-3 at 2. Further, each of the account-creation pages in Mr. Cooper's cases—like nearly all account-creation pages—requires entry of a password and a button to "Continue" to create the account. *Supra*; *see* Tayman Decl., Exs. A–B. Requiring a user to enter a password before creating an account does not make the Terms non-conspicuous; and the presence of the adjacent text that "By clicking 'Save and Continue,' you agree to the ***Terms of Use*** for Mr. Cooper website," Ex. 24-3 at 2, makes Plaintiff's claim fatally flawed.

Plaintiff's authority, on the other hand, includes assent processes that bear no resemblance to this one. In *Berman v. Freedom Financial Network, LLC*, 30 F.4th 849 (9th Cir. 2022), disclosures in website promotional boxes to obtain "[f]ree [s]tuff" were uniquely cluttered and obscured the disclosure; were "in a tiny gray font considerably smaller than the font used in the surrounding website elements, and … so small that it is barely legible to the naked eye"; and contained hyperlinks "in the same gray font as the rest of the sentence, *rather than in blue, the color typically used to signify the presence of a hyperlink*." *Id.* at 853–59 (emphasis added); *see* Tayman Decl., Ex. C.[7] In fact, the Ninth Circuit, in *Berman*, noted that the boxes there could have been cured by including the precise elements present on Mr. Cooper's account-creation page. *See Berman*, 30 F.4th at 857 (noting that "[c]ustomary design elements denoting the existence of a hyperlink include the use of a contrasting font color (typically blue)"); *id.* at 858 ("This notice defect could easily have been remedied by including language such as, 'By clicking the Continue >> button, you agree to the Terms & Conditions.'"). Here, Mr. Cooper's account-registration page is uncluttered, the disclosure is the same font size at the other text, and there is no dispute that the

---

[7] A review of the images at issue makes clear that Mr. Cooper's sign-in page is consistent with, if not more conspicuous, than those the Ninth Circuit has found enforceable. *Compare* Tayman Decl., Exs. A–B, E, *with id.*, Exs. C–D.

hyperlink was a bolded, bright blue and the disclosure stated that, "By clicking 'Save & Continue,' you agree to the **Terms of Use** for Mr. Cooper's website." ECF 24-3 at 2; *supra* at 7–8. Under Plaintiff's own cases, Mr. Cooper's assent process is enforceable.

Similarly, in *Applebaum v. Lyft, Inc*., 263 F. Supp. 3d 454 (S.D.N.Y. 2017), the disclosure language in a phone app asking to "Add phone number" was the "smallest font on the screen, dwarfed by the jumbo-sized pink 'Next' bar"; the "Terms of Service" language was "light blue superimposed on a bright white background, making those 'Terms of Service' … even more difficult to read" and lacking indicia of hyperlinked, such as "bolding"; and the screen did not state that by clicking the "Next" button a user assented to the Terms. *Id.* at 466–67; *see* Tayman Decl., Ex. D. Again, Mr. Cooper's account-registration page is entirely different, as the disclosure is the same font, is proximate to the hyperlinked "**Terms of Use**," and advises that clicking "Save & Continue" is agreement to the Terms. ECF 24-3 at 2; *supra* at 8.

In *Seneca v. Homeaglow, Inc.*, 2024 WL 750029 (C.D. Cal. Feb. 7, 2024), *aff'd*, 2025 WL 852896 (9th Cir. 2025), purchasers of cleaning services had already paid for their cleaning vouchers when they were finally presented with the terms and conditions. *Id.* at *2, *4. Here, by contrast, the hyperlinked Terms were conspicuous and would be expected because they were presented to Plaintiff *before* he created his account and *before* he submitted any online payment to Mr. Cooper.[8] ECF No. 24-3 at 2; *see also* ECF 26 ¶¶ 123–24.

Plaintiff's remaining cases also do not support his position because those webpages' notices were not adjacent to any "Continue" button, not visibly hyperlinked to the terms, and did not advise that clicking a button constituted consent. *See, e.g.*, *Lee v. Plex, Inc*., 773 F. Supp. 3d 755, 766 (N.D. Cal. 2025) (discussing notice at the "very bottom of the visible page, far below the 'Continue with Facebook' button that Plaintiff clicked to create his account," since plaintiff "had no reason to read to the bottom" of the page to click the button and there was no indication that clicking the

---

[8] That Plaintiff agreed to the Terms in exchange for creating an online account and paying his mortgage online, as opposed to by check, phone or wire, answers his questions as to what "would have been the consideration" for agreeing to the Terms (ECF 29 at 12). *See, e.g.*, *Whalen v. NBA Props., Inc*., 2025 WL 1948591, at *8 (N.D. Cal. July 16, 2025) (a promise to be bound serves as adequate consideration).

button was agreement to the terms); *Serrano v. Open Rd. Delivery Holdings, Inc*., 666 F. Supp. 3d 1089, 1096–97 (C.D. Cal. 2023) (discussing notice that was not "adjacent" to the submission button, and that "fail[ed] to identify the hyperlink to Defendant's Terms of Use by more than mere underlining"); *Kuhk v. Playstudios Inc.*, 2024 WL 4529263, at *7 (W.D. Wash. Oct. 18, 2024) (discussing notice where "the hyperlink [to the terms of use] is not underlined, and the font color of the hyperlink is not so contrasting as to clearly suggest that it is a hyperlink"). Again, none of those issues are present here. ECF 24-3 at 2; *supra* at 8.

By contrast, there is a large volume of authority enforcing website agreements parallel to Mr. Cooper's. *Supra* (discussing *Ticketmaster*, *Capps*, *Bender*, and *Phillips*); *see also, e.g.*, *Patrick v. Running Warehouse, LLC*, 2022 WL 10584136, at *5, *6 (C.D. Cal. Oct. 18, 2022) (plaintiff had notice of website's terms where "the link to the Terms appears in contrasting green font that, although small, is still clearly 'legible to the naked eye'" and website notice contained language "that required [plaintiff] to unambiguously manifest assent to the Terms when he clicked 'Place Order' to complete his purchase"), *aff'd*, 93 F.4th 468 (9th Cir. 2024); *Lee v. DoNotPay, Inc*., 683 F. Supp. 3d 1062, 1070–71 (C.D. Cal. 2023) (plaintiff on notice of website terms where hyperlink was "set apart from the surrounding text" and advised that by clicking a "'Continue' button" users agreed to the terms); *Oberstein v. Live Nation Ent., Inc.*, 2021 WL 4772885, at *6 (C.D. Cal. Sept. 20, 2021) (websites provided adequate notice where the "text linking to the [Terms] is placed conspicuously close to the buttons that the users are required to press to sign up, sign in, or complete a purchase" and the "hyperlink that navigates to the TOU is conspicuously blue, while the surrounding text is black"), *aff'd*, 60 F.4th 505 (9th Cir. 2023); *see* Tayman Decl., Ex. E.

\* \* \*

Plaintiff unambiguously assented to the Terms—and its forum selection clause—by opening a Mr. Cooper account. And, again, Plaintiff does not dispute that the *forum selection clause* itself is enforceable and controls this case. *See Atl. Marine*, 571 U.S. at 56–57. This case should be transferred to the Northern District of Texas.

**II.    The Section 1404(a) Analysis Also Favors Transfer.**

Although transfer is warranted under the forum selection provision alone, the traditional Section 1404(a) factors independently support transfer. ECF 24 at 6–10. Plaintiff gives short shrift to the Section 1404(a) analysis, resting instead on his conclusion that "this movie occurred in California." ECF 29 at 4. It did not.

Plaintiff again does not dispute that this case could have been brought in the Northern District of Texas. Nor does he dispute that the interests of justice are best served through transfer— the "predominant" consideration. *Madani v. Shell Oil Co.*, 2008 WL 268986, at *2 (N.D. Cal. Jan. 30, 2008). And though Plaintiff quotes the convenience factors, he only addresses two: (1) Plaintiff's choice of forum, and (2) that third parties may be located in California.

But as Mr. Cooper explained, a plaintiff's choice of forum is given little weight, especially in class actions. ECF 24 at 10 (citing *Lewis v. Sw. Airlines Co.*, 2016 WL 3091998, at *4 (N.D. Cal. June 2, 2016), and *Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987)). Plaintiff ignores this authority and cites none of his own. ECF 29 at 12–13. And although Plaintiff relies on the location of the real property secured by his loan, *id.* at 13, he once again forgets that this is a case solely about Mr. Cooper's website, not any real property or loan secured by property. As the Opening Memorandum explained, Plaintiff's claims about Mr. Cooper's website arose in Texas, where Mr. Cooper's website, policies and procedures, and actions are located. *See* ECF 24 at 7–10; ECF 24-1 ¶¶ 5–8. Therefore, Plaintiff's choice of forum is given little deference. *Lewis*, 2016 WL 3091998, at *4.

And while Plaintiff asserts that third parties Adobe and Meta are located in California, the Amended Complaint does not reference Adobe at all (ECF 26), and Meta has at least five offices in Texas.[9] Regardless, Plaintiff offers no authority for why the location of one third-party's offices should control the forum of this case; it should not. *Motorola Mobility, Inc. v. Microsoft Corp.*, 2011 WL 5834923, at *4 (N.D. Cal. Nov. 21, 2011) (granting transfer over plaintiff's assertions that non-parties were located within transferee district); *Robert Bosch, LLC v. Snap-On Inc.*, 2012

---

[9] *Our Locations*, META, https://www.metacareers.com/locations/?job_region=North%20America (last visited Oct. 18, 2025) (offices in Austin, Fort Worth, Garland, Houston, and Temple, Texas).

WL 12931147, at *8 (C.D. Cal. Apr. 4, 2012) (location of non-party witnesses not dispositive in motion to transfer).

The only other factor Plaintiff mentions at all is the location of the witnesses, which Plaintiff waves off, saying Mr. Cooper did not "explain[] what [its employees'] testimony might be." ECF 29 at 13. First, that is wrong. The Opening Memorandum and Declaration of Edward W. Larroca explained that the majority of the likely witnesses and sources of proof—including the employees responsible for the design and functionality of Mr. Cooper's website its technology systems and data infrastructure—are located in Texas. ECF 24 at 8–9; ECF No. 24-1 ¶¶ 5–8 ("Mr. Cooper maintains six offices in North Texas, which include its primary servicing and originations operations, as well as its technology and website operations" and "documents and records, such as those relating to the website"), ("the majority of Mr. Cooper's U.S. employees," including those (i) on the Products team who are "responsible for and work on the design and functionality of Mr. Cooper's website" and (ii) who work on the Information Technology and Information Security teams, are located in Texas). Regardless, Plaintiff does not dispute that the majority of the relevant witnesses in this case are located in Texas. *See* ECF 29 at 13.

Beyond that, Plaintiff just ignores the other convenience factors. The Opening Memorandum showed that all of those factors—*i.e.*, the location of relevant events, access of proof, cost of litigation, forum's contact with the claims, relative court congestion, and courts' familiarity with the governing law—support transfer. ECF 24 at 7–10; *see also Randles v. Nationstar Mortg., LLC*, 2024 WL 1855720, at *6 (E.D. Cal. Apr. 26, 2024) (transferring venue after weighing applicable Section 1404(a) factors). Plaintiff does not dispute, and thus concedes this point.

At bottom, the nucleus of this case is in Texas because Plaintiff's claims are based on allegations about Mr. Cooper's website, policies and procedures, and actions, all of which occurred in Texas. Courts regularly transfer cases to the forum where the "core conduct relevant" to the dispute was "principally devised, implemented, and managed," rather than defer to a plaintiff's forum. *FTC v. Wyndham Worldwide Corp.*, 2013 WL 1222491, at *2, *3 (D. Ariz. Mar. 25, 2013) (transferring case to venue where "marketing materials and data security practices" were

"developed, implemented, and overseen" and "vast majority" of individuals with knowledge of data security practices worked); *see also Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 841 (S.D.N.Y. 2012) (convenience factors favored transfer where claims "will turn largely on issues such as what Facebook employees did ... [e]vidence as to those issues seems likely to consist almost entirely of (a) documents recording Facebook's actions and/or [plaintiff's] account files; and (b) depositions of Facebook employees responsible for monitoring and disabling accounts"); *Zeta-Jones v. Spice House*, 372 F. Supp. 2d 568, 576 (C.D. Cal. 2005) (granting transfer where witness that maintained website at issue at all relevant times, resided in transferor venue).

And again, it is no matter that the Amended Complaint dismissed named plaintiffs in an effort to avoid transfer and avoid Texas as the proper forum. The forum selection provision and Section 1404(a) factors still independently require transfer.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Mr. Cooper's motion to transfer and transfer this case to the Northern District of Texas, Dallas Division.

Dated:  October 24, 2025

Respectfully submitted,

By: /s/ *W. Kyle Tayman*

ALLISON J. SCHOENTHAL (*pro hac vice*)
*ASchoenthal@goodwinlaw.com*
W. KYLE TAYMAN (*pro hac vice*)
*KTayman@goodwinlaw.com*
REBECCA L. TARNEJA (SBN 293461)
*RTarneja@goodwinlaw.com*
**GOODWIN PROCTER LLP**

Attorneys for Defendant
NATIONSTAR MORTGAGE LLC d/b/a MR. COOPER

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of California by using the CM/ECF system on **October 24, 2025.** I further certify that all participants in the case are registered CM/ ECF users and that service will be accomplished by the CM/ECF system.

I certify under penalty of perjury that the foregoing is true and correct. Executed on **October 24, 2025.**

/s/ *W. Kyle Tayman*
ALLISON J. SCHOENTHAL
W. KYLE TAYMAN
REBECCA L. TARNEJA